# UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| HEIN HETTINGA AND ELLEN HETTINGA )<br>d/b/a SARAH FARMS; and GH DAIRY )<br>d/b/a GH PROCESSING, )<br> )<br>Plaintiffs, )<br>v. )<br> )<br>EDWARD T. SCHAFER, SECRETARY, )<br>UNITED STATES DEPARTMENT OF )<br>DEPARTMENT OF AGRICULTURE; JAMES )<br>R. DAUGHERTY, ADMINISTRATOR OF THE)<br>ARIZONA MILK MARKETING ORDER; AND)<br>UNITED STATES OF AMERICA, )<br> )<br> )<br>Defendants. ) | Case No.<br><br><br><br>COMPLAINT FOR<br>DECLARATORY AND<br>INJUNCTIVE RELIEF<br><br>JURY DEMAND<br>ENDORSED HEREON |

Plaintiffs Hein Hettinga and Ellen Hettinga, doing business under the trade name Sarah Farms ("Hettinga" or "Sarah Farms"), and GH Dairy, doing business as GH Processing ("GH Processing") (collectively "plaintiffs" or "Hettingas"), seek declaratory relief from the application of certain unconstitutional provisions of the Milk Regulatory Equity Act of 2005 ("MREA"), Public Law No. 109-215, codified at 7 U.S.C. §§ 608c(5)(M)-(N). The enactment of these provisions by Congress constitutes an impermissible legislative punishment of plaintiffs, in violation of the Bill of Attainder Clause of the Constitution of the United States of America, and denies them both due process of law and equal protection of the law in violation of the Fifth Amendment of the Constitution. Plaintiffs also seek recoupment from the Secretary of Agriculture and the Administrator of all wrongful assessments paid by GH Processing based upon the unconstitutional provisions of the MREA.

## PARTIES, JURISDICTION AND VENUE

1.      Plaintiffs Hein Hettinga and Ellen Hettinga are married individuals and residents of the State of Texas who own and operate a dairy business under the trade name

Sarah Farms. The principal place of business for Sarah Farms is its dairy processing plant in Yuma, Arizona.

2.     Sarah Farms is an integrated producer-handler that produces milk on farms owned by the Hettingas and processes that raw milk into bottled milk and other dairy products for sale directly to consumers, milk dealers or retailers.

3.     The Hettingas are also partners in a family partnership known as GH Dairy, in conjunction with their son Gerben Hettinga, whose ownership interest in the partnership is held by Gerben Hettinga as trustee for the Gerben Hettinga Revocable Trust. The Hettingas and their son are the only partners in this family partnership.

4.     GH Dairy is a general partnership registered with the State of California. The principal place of business for GH Dairy is its plant, separate from Sarah Farms, also located in Yuma, Arizona.

5.     GH Dairy processes raw milk into bottled milk and other dairy products for sale directly to consumers, milk dealers, or retailers. This plant operates under the trade name "GH Processing."

6.     GH Processing is not a producer-handler of milk, but rather purchases some of the milk it processes from other producers. GH Processing sells its milk and milk products exclusively into the State of California and has done so since its inception in 2003.

7.     Defendant Edward T. Schafer is the Secretary and Chief Executive Officer of the United States Department of Agriculture ("Secretary"), and is sued in his official capacity only.

8.     Defendant James R. Daugherty is the Marketing Administrator for the Arizona Milk Marketing Area, formerly known as the Arizona-Las Vegas Milk Marketing Area ("Administrator"), and an employee and officer of the United States Department of Agriculture who carries out the orders and instructions of the Secretary and is sued in that capacity.

9.      Defendant United States of America is named since the plaintiffs challenge the unconstitutional actions of Congress in enacting the Milk Regulatory Equity Act of 2005.

10.     Plaintiffs file this Complaint principally with regard to the enactment of the Milk Regulatory Equity Act ("MREA"), Public Law No. 109-215, codified at 7 U.S.C. §608c(5)(M-N).

11.     This case is preceded by a still pending action filed in the United States District Court for the District of Columbia entitled Hein Hettinga v. U.S., 518 F.Supp.2d 58 (D.D.C. 2007) (Case No. 06-CV-1637 (RJL)).   In that case, United States District Judge Richard J. Leon mandated that plaintiffs here proceed with an administrative action before the Secretary under 7 U.S.C. § 608c(15)(A) before judicially challenging the MREA.

12.     Plaintiffs appealed that decision and simultaneously petitioned for administrative review before USDA.  The United States Court of Appeals for the District of Columbia has held oral argument on the Hettingas' case, and a decision is forthcoming from that Court.  See Hein Hettinga, et al., v. U.S., Case No. 07-5403 (D.C. Cir.).

13.     Without waiving their right to proceed directly to Court to challenge the constitutionality of the MREA, plaintiffs filed a Petition for administrative review before USDA.

14.     Plaintiffs bring this suit pursuant to 7 U.S.C. § 608c(15)(B), following exhaustion of administrative remedies before the United States Department of Agriculture. In that administrative proceeding, the USDA judicial officer issued a final decision concluding that the administrative review provisions of 7 U.S.C. § 608c(15)(A) are not applicable to the facial constitutional challenge asserted by the Hettingas and concluded that USDA could not grant them the requested relief from the unconstitutional provisions of the MREA.  A copy of the USDA Judicial Officer's decision is included as Exhibit "A" to this Complaint.

15.     Plaintiffs maintain any alleged administrative exhaustion requirements applicable to challenges to milk marketing orders under 7 U.S.C. § 608c(15)(A) is inapplicable to a facial constitutional challenge to passage of the MREA by Congress.

16.     This action is filed in this Court because any judicial challenge to the USDA Judicial Officer's final decision is to be filed no later than twenty (20) days after that decision in "...any district in which such handler is an inhabitant, or has his principal place of business." 7 U.S.C. § 608c(15)(B).

17.     The principal place of business for the plaintiffs is located in this judicial district and division.

18.     This Court has jurisdiction of plaintiffs' claims under 28 U.S.C. §§ 1331, 1337, 1346(a)(2) and 2201, and 7 U.S.C. § 608c(15)(B).

19.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b), § 1391(c), and § 1391(e), and 7 U.S.C. § 608c(15)(B).

## NATURE OF THE CASE

20.     Prior to April 2006, Sarah Farms had been exempt from the minimum pricing and pooling provisions of Federal Milk Marketing Orders adopted by the U.S. Department of Agriculture ("USDA") under the Agricultural Milk Marketing Agreements Act of 1937, 7 U.S.C. § 601 et seq. ("AMAA").

21.     On March 28, 2006, Congress enacted the MREA, which was signed by the President on April 11, 2006.  Section 2(a) of that statute amended the AMAA by adding 7 U.S.C. § 608c(5)(N) ("Subsection N") which singled out Plaintiffs for punishment and inflicted extraordinary injuries upon their ability to conduct their dairy businesses, by directly imposing upon them, through their Sarah Farms operation alone, mandatory price controls and a concomitant obligation to make prohibitively great monetary payments to their competitors in the production and sale of fluid milk in the newly revised Arizona Federal Milk Marketing area.  This statutory exaction has resulted in a reduction in the revenues of the Sarah Farms' operation and enforced subsidization of their direct competitors.

22.     Section 2(a) also added a new 7 U.S.C. § 608c(15)(M) ("Subsection (M)") which directly imposed on GH Processing alone, mandatory price controls on its interstate sales of milk into the State of California and a concomitant obligation to make prohibitively large monetary payments to its competitors in the production and sale of fluid milk in the same Arizona Federal Marketing Area. This statutory exaction has resulted in a reduction in GH Processing's revenues and enforced subsidization of its direct competitors and has caused other harms to GH Processing.

23.     Floor statements during the debates on the MREA in the House of Representatives, as set forth in the Congressional Record, demonstrate that the MREA is a piece of special interest legislation intended to punish the Hettingas for the manner in which they have lawfully operated their dairy businesses for more than a decade.

24.     The floor statements in the House also demonstrate that the MREA was passed in an effort to preclude the Hettingas from effectively pursuing a lawsuit they had brought challenging a final rule issued by USDA in February 2006 that subjected the Sarah Farms operation, and other producer-handlers similarly situated, to Federal price controls. The MREA was adopted by the House of Representatives and cleared for signature by the President the night before the scheduled oral argument on plaintiffs' motion for a preliminary injunction against the rule.

## BACKGROUND – THE HETTINGAS' BUSINESS OPERATIONS

25.     As noted above, the Hettingas own and operate an integrated milk business in Yuma, Arizona that processes and markets milk directly and solely from their own farms and does business under the trade name Sarah Farms.

26.     Sarah Farms is a family business owned and operated by Hein Hettinga and his wife, Ellen Hettinga. Hein Hettinga named the business "Sarah Farms," after his daughter, who works at the plant. To this day, the Hettingas alone own and control all aspects of the milk production and milk processing of their Sarah Farms operation.

27.    Hein Hettinga, who began his career in the dairy industry as a first generation Dutch immigrant trimming cow hooves, has built a business that supplies good and wholesome milk, which is free from added growth hormones such as rBST, to retailers throughout the State of Arizona.

28.    As an integrated business, the Sarah Farms operation is a "producer-handler" of milk within the meaning of the AMAA and federal regulations. "Producer-handlers are dairy farmers who process milk from their own cows in their own plants and market their packaged fluid milk and other dairy products themselves." http://www.ams.usda.gov/dyfmos/mib/prod_hand_dscrp.pdf (June 6, 2005). See, e.g., 7 C.F.R. § 1131.10 (2005).

29.    Because they are integrated operations, producer-handlers, such as the Hettingas, bear the full risk of all aspects of the dairy business. For example, a producer-handler bears the risks of illness in the herd, mechanical failures in the processing plant or inability to run the plant at an efficient level of operation, and/or the inability to find customers for its production of milk or the failure of customers to pay.

30.    The Hettingas, like other producer-handlers, bear the entire cost of milk production and they are fully exposed to the risk of costs in excess of production.

31.    In contrast, when the processing plant and milk production are not part of the same business entity, the handler of milk and the producer of milk are protected from the risks of the other entity's operations. The handler of milk faces no risks from higher milk production costs. For instance, if it costs the farmer selling milk to a handler more to produce milk than the minimum price mandated by Federal law, the handler must pay only the minimum price. Moreover, for the dairy farmer or producer of milk who has no plant of its own, the federal milk market blend price is a final price from the market and is not subject to adjustment based upon the efficiency or profitability of the processing plant.

32.    Each month, the Hettingas, through Sarah Farms, process and sell in the former Arizona-Las Vegas Milk Marketing area (now known as the Arizona Marketing Area,

6

and referred to alternatively as "Order 131", see 7 C.F.R. part 1131) more than 3,000,000 pounds of their own farm-produced milk. The Hettingas, through Sarah Farms, are the only producer-handlers that sell more than 3,000,000 pounds of their own milk per month in the Arizona Marketing area.

33.     In addition to Sarah Farms, Hein and Ellen Hettinga own a one-half interest in a family partnership that operates a second, independent plant in Yuma, Arizona known as GH Processing. Their son, Gerben Hettinga, as the trustee of his revocable trust, owns the other one-half interest in the partnership that operates GH Processing.

34.     GH Processing operated as an unregulated "non-pool plant" from its inception until the passage of the MREA. GH Processing, while located in Arizona, sells all of the milk that it processes into the State of California. As a handler that does not sell milk into a federally regulated marketing area, GH Processing was not subject to federal minimum price regulation until the passage of the MREA.

## EFFORTS BY THE DAIRY INDUSTRY
## TO DESTROY PLAINTIFFS' DAIRY BUSINESSES

35.     From the inception of their business and at all times relevant to this Complaint, the Hettingas through their Sarah Farms operation processed only their own milk and bore sole responsibility for the disposition of the milk produced on their farms through their Sarah Farms operation.

36.     Under the terms of the AMAA and prior USDA regulations, as producer-handlers, the Hettingas were exempt from the pricing and pooling requirements of the Federal Milk Marketing Order applicable to the area formerly known as the Arizona-Las Vegas Milk Marketing area.

37.     The dairy producers and processors who were subject to the pricing and pooling requirements undertook a decade-long campaign seeking to subject the Hettingas to

those requirements, and thereby eliminate the one source of competition they faced in the sale of fluid milk to the public in that market. The largest members of the dairy industry in the United States and the largest dairy organizations in Arizona and California pursued a "dual strategy" of legislation and regulation against the Hettingas, "due to the unpredictability of the legislative route, and the slowness of the administrative route." See "At Last!  USDA Announces Long Awaited Producer-Handler Recommended Decision," United Dairymen, May 2005, at 6.

38.     Over the years, the United States Department of Agriculture repeatedly rejected the efforts of large milk cooperatives and handlers to eliminate the producer-handler exemption and subject these entities to the pricing and pooling requirements.

39.     The Department consistently rejected these efforts even during periods when producer-handlers played a much more significant role in the market than they do today.  In recent years, both the number of producer-handlers and the percentage of fluid milk that they sell have declined significantly.

40.     In 1996, Congress directed the Secretary of Agriculture to undertake a major revision of the Federal Milk Marketing Orders through rulemaking.  See the Federal Agricultural Improvement and Reform Act of 1996, 7 U.S.C. § 7253(a).  In that rulemaking, two of the Hettingas' direct competitors requested that the Secretary of Agriculture abolish or severely limit the producer handler-exemption.

41.     During this milk marketing order, the Secretary rejected the proposal to modify the producer-handler exemption for lack of legal authority.

In the legislative actions taken by Congress to amend the AMAA since 1965, the legislation has consistently and specifically exempted producer-handlers from regulation. The 1996 Farm Bill, unlike previous legislation, did not amend the AMAA and was silent on continuing to preserve the exemption of producer-

handlers from regulation.  However, past legislative history is replete with the specific intent of Congress to exempt producer-handlers from regulation.

63 Fed. Reg. 4802, 4934-40 (Jan. 30, 1998), 64 Fed. Reg. 16025, 16135 (April 2, 1999).

42.    In June 2002, various parties, including the largest milk cooperative in the country, requested that the Department of Agriculture initiate a formal rulemaking to subject the Hettingas' Sarah Farms operation to the pricing and pooling requirements of the then Arizona-Las Vegas Milk Marketing Order.

43.    The Department initiated such a proceeding in September 2003, to consider whether to impose minimum pricing and pooling obligations on producer-handlers in two geographic areas -- the Arizona-Las Vegas (Order 131) and the Pacific Northwest areas (Order 124).

44.    At the rulemaking hearings, the largest milk processors and cooperatives joined in calling for imposition of such regulations, in order to increase the costs that the Hettingas and other producer-handlers faced in doing business.

45.    Notwithstanding the limited authority granted to the USDA under the AMAA and agency rules that for almost 70 years had exempted producer-handlers from the pricing and pooling provisions of Federal Milk Marketing Orders, on February 24, 2006, USDA adopted a Final Rule that purported to subject producer-handlers operating in the Arizona-Las Vegas and Pacific Northwest Milk Marketing areas to the pricing and pooling provisions of their respective Marketing Orders if the producer-handlers produced and sold more than 3,000,000 pounds per month of their own milk.  Milk in the Pacific Northwest and Arizona-Las Vegas Marketing Areas; Order Amending the Orders, 71 Fed. Reg. 9430 (Feb. 24, 2006).

46.     The Rule required covered producer-handlers in these two geographic areas to pay a substantial portion of their monthly revenues into a pool to subsidize their competitors in those markets.  The net effect of the Rule was to eliminate competition from the Hettingas for large dairy interests operating in the then defined Arizona-Las Vegas Milk Marketing area, by subjecting the Hettingas to onerous payment obligations that would destroy their ability to operate their business.  The Final Rule became effective on April 1, 2006.

47.     On March 15, 2006, the Hettingas filed a lawsuit in the United States District Court for the Northern District of Texas, Lubbock Division, challenging the legality of the Final Rule.  Hettinga v. Johanns, Case Number 5-06CV0052-C.   In that lawsuit, the Hettingas sought a declaration that the Final Rule was invalid on the grounds that: (1) the Department of Agriculture lacked statutory authority under the AMAA to impose minimum pricing and pooling obligations on producer-handlers who sell only milk that they produce from their own cows and do not purchase milk from other producers; (2) the Department had acted arbitrarily and capriciously by changing, without explanation, its prior interpretation of the applicable statutes under which the agency had concluded in 1998-1999 that it lacked authority to eliminate the producer-handler exemption for businesses such as their Sarah Farms operation; and (3) the Department had acted arbitrarily and capriciously by finding that a de minimis economic effect (allegedly two to four cents per hundredweight of milk, or approximately one-half of one percent of the sales price) justified subjecting producer-handlers to the pricing and pooling controls, on the ground that this slight economic effect created "disorderly marketing conditions" within the meaning of the AMAA.

## ENACTMENT OF THE MREA

48.     Oral argument on Hettingas' motion for a preliminary injunction in the Johanns lawsuit was scheduled for March 29, 2006.  The scheduling of this hearing prompted immediate action by Congress to preempt judicial review of Hettingas' legal challenge to the Department of Agriculture rule.

49.     On the evening of March 28, 2006, the House of Representatives passed the legislation whose constitutionality is challenged in this petition and cleared it for signature by the President.

50.     The MREA, as adopted, contained provisions that singled out and punished the Hettingas in two respects.  First, Subsection (N) of the law directly mandated that the pricing and pooling requirements of the Arizona-Las Vegas Milk Marketing Order must be applied to any producer-handler that sold more than 3,000,000 pounds of fluid milk per month in that area.   There was only one producer-handler in the Arizona-Las Vegas marketing area that sold in excess of 3,000,000 pounds per month – the Hettingas' Sarah Farms operation.   Second, Subsection (M) of the law directly imposed the pricing and pooling requirements of the federal milk marketing orders on all sales into the California market (which otherwise was not subject to Federal pricing and pooling regulations) by any handler not otherwise required to pay federal minimum prices.  Again, there was only one handler in the Arizona-Las Vegas Milk Marketing area, indeed as far as is known only one handler in the nation, that satisfied this criterion -- the GH Processing plant owned by the Hettingas' family partnership.

51.     The passage of the MREA was the culmination of a prolonged legislative effort led by members of the Arizona and California Congressional delegations.  From the outset of that effort, Hein and Ellen Hettinga and their dairy businesses were specifically targeted for punishment.

52.     In the Senate, the legislative effort to adopt the MREA was led by United States Senator Jon Kyl of Arizona.  Starting in the 107th Congress, Senator Kyl introduced legislation to impose a limit on the amount of bottled milk that a producer-handler could sell in the then defined Arizona-Las Vegas milk marketing area without becoming subject to the pricing and pooling requirements of the applicable Milk Marketing Order.  From the outset, this limitation on the size that a producer-handler could obtain was directed specifically at the

Hettingas and their Sarah Farms operation. The enactment of this provision would directly benefit Sarah Farms' major competitors.

53.    In the House of Representatives, the legislative effort to adopt the MREA was led by Representative Devin Nunes of California, whose District included Tulare County, the single-largest milk producing county in the United States. Beginning in 2003, Congressman Nunes introduced in successive Congresses the House version of the MREA. While nominally broad in scope, the bill targeted for adverse treatment the milk processing operations of the GH Processing plant owned by the Hettingas' family partnership. The bill attracted substantial opposition because it was overtly discriminatory. For example, Representative Joe Baca of California opposed the proposal to eliminate the producer-handler exemption "for a single dairy operator," petitioner Hein Hettinga. Congressman Baca objected that "Sarah Farms, who operates dairies and bottling plants in the Chino Basin in Southern Arizona was being singled out unfairly" and that any legislation which would "financially penalize one dairyman can only be described as discriminatory." Official Website of Representative Joe Baca, "Congressman Baca Fights for California Agriculture," www.house.gov/baca/legislation-agriculture.html (last visited February 1, 2007).

54.    In the fall of 2005, after USDA had published its proposed regulation to amend the Arizona-Las Vegas and Pacific Northwest Orders to subject producer-handlers in those two areas to the pricing and pooling requirements if they sold more than 3,000,000 pounds of milk per month, the proponents of the MREA revised the bill.

55.    In order to address the concerns of the Arizona dairy interests, the revised bill (S. 2120) imposed the 3,000,000 pound limitation only in the Arizona-Las Vegas Milk Marketing area. Similarly situated producer-handlers in the Pacific Northwest area were not covered by the bill, even though producer-handlers in both areas were covered by the proposed regulation. The scope of the bill thus was narrowed to target the Hettingas exclusively. Further, to address the concerns of California dairy interests, the revised bill included a provision that imposed the minimum Federal pricing and pooling provisions of its

local Federal Milk Marketing Order on any handler that sold packaged milk in a State, such as California, that was not covered by a Federal Milk Marketing Order. This provision again targeted the Hettingas and imposed severe financial consequences upon all sales of milk by GH Processing into California by forcing GH to pay the Federal minimum price, for all milk it purchased in Arizona, which is higher than the prices that its California competitors pay for their milk. Another provision of the MREA, Section 2(b), explicitly removed the State of Nevada from the coverage of any Federal Milk Marketing Order. The effect of this provision was to allow at least eight handlers of milk in Nevada, including some operations that are larger than GH Processing, to sell their milk into California without being subject to either Federal or State of California minimum price controls. These two provisions thus placed GH Processing at a significant competitive disadvantage for its sales into California.

56.    On or about December 16, 2005, the revised MREA passed the Senate by "unanimous consent", without having been the subject of any Committee hearing or floor debate.

57.    On or about March 28, 2006, the evening before the <u>Johanns</u> lawsuit was to be argued in Texas, the MREA was brought before the House of Representatives on the Suspension Calendar, without benefit of a prior Committee hearing. When objection was made to its consideration, the proponents moved to suspend the rules and pass the bill over the objections. This procedure required a super-majority vote of two-thirds to suspend the rules and pass the measure. Following a short floor debate, the bill narrowly passed the House and was cleared for action by the President.

## THE UNCONSTITUTIONAL IMPACT OF THE MREA

58.    As enacted, Section 2(a) of the MREA amended the AMAA, 7 U.S.C. § 608c(5), by adding, <u>inter alia</u>, new Subsections (M) and (N). They provide:

(M)    Minimum Milk Prices for Handlers.—

(i)    Application of minimum price requirements. -- Notwithstanding any other provision of this section, a milk handler

described in clause (ii) shall be subject to all of the minimum and uniform price requirements of a Federal milk marketing order issued pursuant to this section applicable to the county in which the plant of the handler is located, at Federal order class prices, if the handler has packaged Fluid milk product route dispositions, or sales of packaged fluid milk products to other plants, in a marketing area located in a State that requires handlers to pay minimum prices for raw milk purchases.

     (ii)    Covered milk handlers.— Except as provided in clause (iv), clause (i) applies to a handler of Class I milk products (including a producer-handler or producer operating as a handler) that—

     (I)    operates a plant that is located within the boundaries of a Federal order milk marketing area (as those boundaries are in effect as of the date of the enactment of this subparagraph);

     (II)    has packaged fluid milk product route dispositions, or sales of packaged fluid milk products to other plants, in a milk marketing area located in a State that requires handlers to pay minimum prices for raw milk purchases; and

     (III)    is not otherwise obligated by a Federal milk marketing order, or a regulated milk pricing plan operated by a State, to pay minimum class prices for the raw milk that is used for such dispositions or sales.

     (iii)    Obligation to pay minimum class prices.--For purposes of clause (ii) (III), the Secretary may not consider a handler of Class I milk products to be obligated by a Federal milk marketing order to pay minimum class prices for raw milk unless the handler operates the plant as a fully regulated fluid milk distributing plant under a Federal milk marketing order.

     (iv)    Certain handlers exempted.--Clause (i) does not apply to—

     (I)    a handler (otherwise described in clause (ii)) that operates a nonpool plant (as defined in section 1000.8(e) of title 7, Code of Federal Regulations, as in effect on the date of the enactment of this subparagraph);

     (II)    a producer-handler (otherwise described in clause (ii)) for any month during which the producer-handler has

route dispositions, and sales to other plants, of packaged fluid milk products equaling less than 3,000,000 pounds of milk; or

(III) a handler (otherwise described in clause (ii)) for any month during which--

(aa)  less than 25 percent of the total quantity of fluid milk products physically received at the plant of the handler (excluding concentrated milk received from another plant by agreement for other than Class I use) is disposed of as route disposition or is transferred in the form of packaged fluid milk products to other plants; or

(bb)  less than 25 percent in aggregate of the route disposition or transfers are in a marketing area or areas located in one or more States that require handlers to pay minimum prices for raw milk purchases.

(N)    Exemption for Certain Milk Handlers.--Notwithstanding any other provision of this section, no handler with distribution of Class I milk products in the marketing area described in Order No. 131 shall be exempt during any month from any minimum price requirement established by the Secretary under this subsection if the total distribution of Class I products during the preceding month of any such handler's own farm production exceeds 3,000,000 pounds.

59.    Subsection (N) has the effect of directly imposing pricing and pooling requirements on any producer-handler in the Arizona-Las Vegas Milk Marketing area that satisfies the 3,000,000 pounds per month criterion.  A covered producer-handler's obligation to comply with the price controls and make the payments into the pool for distribution to its competitors is absolute and does not depend upon the validity of the February 24, 2006 Department of Agriculture rule or the rationality of the factual findings underlying that rule. That is, even if USDA were to revert to its 1998-1999 interpretation that the law precluded elimination of the producer-handler exemption or if it were to find that the facts did not show the existence of disruptive marketing conditions in this area, a producer-handler in the newly revised Arizona Milk Marketing area that produced more than 3,000,000 pounds of fluid

milk per month still would be expressly subject to the pricing and pooling requirements of that Order under the terms of the MREA.

60.     Subsection (N) applies to only one Milk Marketing area, the new Arizona area. It does not apply the disqualification from the exemption to any producer-handlers in the Pacific Northwest Milk Marketing area, even though that area and those producer-handlers were covered by the Department of Agriculture rule that the Hettingas were challenging in the <u>Johanns</u> case.

61.     There is only one producer-handler in the then Arizona-Las Vegas Milk Marketing Area (now the Arizona Milk Marketing Area) – "Order No. 131" -- that distributes more than 3,000,000 pounds per month of fluid milk (known under the AMAA regulatory scheme as "Class I products"). That producer-handler is the Sarah Farms operation owned by the Hettingas. Thus, the effect of Subsection (N) of the MREA is to make one and only one producer-handler – Sarah Farms – ineligible for the producer-handler exemption that otherwise would apply. In this manner, the MREA singles out the Hettingas and makes them the only producer-handler operation in the United States that is subject to a direct statutory command that they must be subject to the pricing and pooling requirements of the local Federal Milk Marketing Order.

62.     Similarly, Subsection (M)(i) provides that the pricing and pooling requirements of its local Federal Milk Marketing Order shall apply to a handler that sells fluid milk in packaged form "in a marketing area located in a State that requires handlers to pay minimum prices for raw milk purchases." One such State is California, in which milk prices are not governed by Federal Milk Marketing Orders. Rather, California is governed by the Gonsalves Milk Pooling Act of 1967, enacted under a separate State statute. During

the course of the 1996-1999 revision of the Federal Milk Marketing Orders (see ¶ 21), California declined to join the federal milk marketing system. See 7 U.S.C. § 7253(a)(2).

63.     Subsection (M) thus subjects the Hettingas' family partnership, through GH Processing, to the pricing and pooling requirements of the new Arizona Milk Marketing Order, and its onerous payment obligations, for any sales of milk that GH Processing makes to California purchasers.

64.     Statements made in the course of the floor debate in the House of Representatives confirm that Subsection (N) was intended to short circuit judicial consideration of Hettingas' challenge to the Department of Agriculture rule, which was scheduled to be heard the next morning, and to impose a mandatory statutory requirement that Plaintiffs must be subject to the pricing and pooling provisions of the AMAA. The net effect of this provision was a statutory directive that Plaintiffs must make large payments from their revenues to subsidize their competitors in the Arizona Milk Marketing area.

65.     For example, during the course of the floor debate, members specifically stated that the Act was written to target "the Yuma handler" or the "plant in Yuma." Congressional Record H1151 (March 28, 2006) (comments of Rep. Collin Peterson).

66.     Thereafter, Rep. Obey had an exchange with Rep. Goodlatte, in which Congressman Obey suggested that the Act was a special bill for a select few interests in the dairy industry and that the Act targeted and punished the Hettingas for lawfully operating their dairy businesses plant outside of the federal pricing and pooling regulations. Id. at H1151, H1152.

67.     In a later exchange between Rep. Lewis and Rep. Nunes, Plaintiffs Hein Hettinga was specifically identified as the target of the Act. Congressman Lewis further

noted that passage of the Act would likely deny the Hettingas an opportunity to challenge the Secretary's recently enacted regulations in court. Id. at H1153.

68.     The floor debate also demonstrates that the Act was intended to punish the Hettingas for their interest in GH Processing for allegedly "exploiting a loophole" in federal Milk Marketing regulations. Id. at H1152 (comments of Rep. Cardoza), H1153 (comments of Rep. Gutknecht).

69.     The passage of the MREA had the effect intended by its proponents when they pushed to obtain passage of the measure prior to the scheduled preliminary injunction hearing in the Johanns lawsuit in the Northern District of Texas.  At the opening of oral argument the next morning, counsel for the United States Department of Agriculture handed the judge a copy of the pages of the Congressional Record in which the House had adopted the bill the previous evening.  While noting that the President had not yet signed the measure, counsel nonetheless argued that since President Bush had (to that point) never vetoed a bill during his tenure in office, the MREA was highly likely to become law; that it conclusively subjected the Hettingas' Sarah Farms operation to the pricing and pooling obligations of the AMAA; and that this development constituted a conclusive reason why the court should deny the motion for a preliminary injunction.

70.     In its decision denying the motion for a preliminary injunction, the District Court noted that the passage of the Act effectively mooted Hettingas' legal challenge to the validity of the Department of Agriculture rule.  The case thereafter was voluntarily dismissed without prejudice.

71.     The MREA punishes the Hettingas alone, by requiring them to make prohibitive monthly payments into the Arizona Milk Marketing Pool equal to the difference

between the federal minimum Class I milk price, which is the price applicable to raw milk processed for bottling, and the average price of all milk processed under the Arizona Marketing Order.   The Administrator has mandated that the Hettingas make monthly payments which amount to hundreds of thousands of dollars per month and which come directly from the revenues of the Hettingas' Sarah Farms operation.   Through the pooling mechanism, this monthly payment is then distributed to the Hettingas' direct competitors.

72.   The MREA applies with specificity to the Hettingas and singles them out for legislative punishment.   Subsection (N) of the MREA addresses only the Arizona-Las Vegas Milk Marketing area and does not apply to any other marketing area.   While the Hettingas are not identified by name in the text of the MREA, their identity as the target of the Congressional action is easily ascertainable.   The Congressional debates and the rulemaking record compiled by the Department of Agriculture establish that there is only one producer-handler in the Arizona-Las Vegas market that produces more than 3,000,000 pounds per month of its own milk – Sarah Farms.

73.   The MREA imposes legislative punishment on the Hettingas.   The statute's infliction of large mandatory payments and the mandatory subsidization of the Hettingas' main competitors, without any countervailing benefit, and the short-circuiting of their attempt to obtain judicial review of the Department of Agriculture rule constitute legislative punishment for the prior activities of their dairy operations.

74.   The legislative history of the MREA shows a Congressional intent to punish the Hettingas.

75.   No other producer-handler operation in the country has been directly subjected to the type of mandatory statutory penalties that Congress imposed upon the Hettingas through the MREA.

76.   The MREA also imposes legislative punishment on the Hettingas' family partnership through subsection (M) by punishing them and them alone for selling packaged fluid milk into California from GH Processing. Subsection (M) requires GH Processing to pay the federal minimum price for such sales, and these payments are, as with those made by the Hettingas' producer-handler operation, Sarah Farms, distributed to the competitors of GH Processing through the Arizona milk marketing pool. These pooled payments are distributed to Arizona dairy farmers for sales into California. Accordingly, California dairy farmers receive no direct benefit from the regulation of GH Processing. Furthermore, while milk processors regulated under the California state laws pay a California minimum price, GH Processing must pay the federal minimum price applicable to Arizona, which tends to be higher than the California minimum prices.

77.   Subsection (M) of the MREA applies with specificity to the Hettingas through their family partnership that owns GH Processing plant and singles them out for legislative punishment. While GH Processing and the Hettingas are not identified by name in the text of the MREA, their identity as the target of the Congressional action is easily ascertainable. The Congressional debates and the records of the Department of Agriculture establish that there is only one handler in the country that is obligated to make payments under subsection (M) – GH Processing.

78.   Subsection (M) changes the historical operation of the Federal Milk Marketing Orders for GH Processing. While other handlers of milk are subjected to

regulation only when they sell milk into a federal milk marketing area, Subsection (M) imposes minimum price regulations based not on the location where the milk is sold, but instead based solely on the location of the GH Processing plant. Even though GH Processing sells no milk into a federally regulated marketing area, the MREA imposes federal pricing regulations on the plant. GH has been subjected to unlawful monetary assessments by the Administrator of the Arizona Milk Marketing Order in the amount of hundreds of thousands of dollars per month since approximately May of 2006.

79.     The punishments imposed by Subsection (M) have had severe adverse effects upon GH Processing. These burdens do not further any non-punitive legislative purpose, especially in light of the fact that at the same time the MREA imposes federal price regulation on GH Processing, Section 2(b) of the Act (codified at 7 U.S.C. § 608c(11)(D)) removes the entire State of Nevada from the purview of the federal milk marketing orders. Essentially, these Nevada provisions permit any handler located in Nevada to sell milk into California without being required to pay either a federal minimum price or the California minimum price.

80.     The Nevada provision provides to Nevada milk handlers the ability to sell milk into the State of California without being subjected to the minimum price controls of any Federal or State milk marketing order. Thus, the MREA on the one hand imposes punitive provisions on GH Processing by subjecting it to minimum Federal price controls for its interstate sales into California while on the other hand exempting interstate sales by Nevada handlers into California from all minimum price controls.

81.     The terms of the MREA were mandated by Congress and imposed upon the Hettinga by legislative fiat. The Secretary, the Administrative Law Judge and the Judicial

Officer have conceded that the Secretary had no discretion under the terms of the MREA to make the governing Milk Marketing Order "ineffective" against the Hettingas or to vary any obligations imposed upon them by the MREA.

82.     Furthermore, while changes to Milk Marketing Orders generally are subject to approval by a producer referendum under the AMAA, the MREA expressly provided that, "these amendments shall not be subject to referendum…"  Compare 7 U.S.C. § 608c(19) with § 2(d) of the MREA.

83.     "These amendments" to the Arizona Milk Marketing Order as they apply to the Hettingas cannot be altered by the Secretary, producers, or handlers.  Instead, because they were imposed directly by Congress and, because they are mandatory, they can only be changed by Congress.

84.     The USDA confirmed this point in its implementation of the MREA.  On May 1, 2006, the day the MREA took affect by its own terms, the Department published a direct final rule in the Federal Register that complied with the requirements in § 2(d) that the agency must amend all Milk Marketing Orders to provide that the entities described in the new Section 608c(5)(M) "will be fully regulated."   Milk in the Northeast and Other Marketing Areas; Order Amending Orders, 71 Fed. Reg. 25495 (May 1, 2006).

85.     The USDA issued the final rule without notice or an opportunity for public comment because "public procedure is unnecessary and impracticable…" Id. at 25497.  The Secretary never claimed to have discretion to refuse to implement the terms of the MREA or to terminate the Arizona-Las Vegas Marketing Order in response to its passage.  Rather, in its contemporaneous actions, the Department incorporated the mandatory changes dictated by

Congress in the MREA into the Orders with exacting precision; nothing more and nothing less.

86.     Even though the Secretary has never held a formal rulemaking hearing regarding Subsection (M) of the MREA, Congress mandated the means of implementation of those terms upon the Secretary. The failure by the Secretary to adopt the terms of the MREA as Congress directed would have been an unreasonable, arbitrary and capricious action.

87.     As a result of the passage of the MREA, the Hettingas filed a suit in the United States District Court for the District of Columbia as a facial challenge to the constitutionality of the MREA. See Hein Hettinga and Ellen Hettinga d/b/a Sarah Farms and GH Dairy d/b/a/ GH Processing v. United States of America, Case No. 06-CV-1637 (RJL).

88.     The Court dismissed that litigation for lack of subject matter jurisdiction holding that the Hettingas, "…must exhaust their mandatory administrative remedies before they seek relief from this court. Having failed to do so, this court lacks jurisdiction and hereby dismisses plaintiffs' amended complaint." (Memorandum of Opinion dated July 31, 2007, Page 8).

89.     The Hettingas have appealed that decision to the United States Court of Appeals for the District of Columbia. In order to preserve their constitutional challenges if Section 15(A) were interpreted to require them to exhaust the administrative remedy before filing their facial constitutional challenge in federal court, and without prejudicing their right to continue with their appeal, the Hettingas did exhaust their administrative remedies under 7 U.S.C. § 608c(15)(A). See Avocados Plus, Inc. v. Veneman, 370 F.3d 1243, 1251 n.4 (D.C. Cir. 2004).

90.     An opinion is forthcoming from the Court of Appeals on plaintiffs' claims that the federal courts may exercise jurisdiction over their claim without exhausting the administrative remedy. This Complaint preserves plaintiffs' right to have their constitutional

claims reviewed in federal court in any event. This Complaint is timely filed with twenty (20) days following the final decision of the USDA Judicial Officer holding that the Secretary cannot provide any relief to the Hettingas due to the mandates of Congress expressed in the terms of the MREA.

## CLAIMS FOR RELIEF

## FIRST CLAIM FOR RELIEF

## (BILL OF ATTAINDER)

91.     Plaintiffs repeat and incorporate all previous allegations of this Complaint.

92.     Article I, § 9, cl. 3 of the Constitution provides that "[n]o Bill of Attainder or ex post facto Law shall be passed."

93.     Section 2(a) of the MREA constitutes an unconstitutional Bill of Attainder, because it singles out plaintiffs for legislative punishment.

94.     The Act severely punishes plaintiffs for their past lawful operation of Sarah Farms and GH Processing outside of federal milk pooling and pricing regulations. It also denied the Hettingas the right to seek judicial resolution of their challenge to USDA's regulation that purported to subject their Sarah Farms operation to the pricing and pooling provisions of the AMAA.

95.     The Act summarily punishes plaintiffs pursuant to legislative findings and without a judicial determination. The burdens imposed by the statute constitute legislative punishment and do not further any non-punitive legislative purpose. The legislative history of the MREA demonstrates a Congressional intent to punish plaintiffs. Section 2(a) of the Act therefore constitutes an unconstitutional Bill of Attainder.

## SECOND CLAIM FOR RELIEF

## (DENIAL OF DUE PROCESS)

96.     Plaintiffs repeat and incorporate all previous allegations of this Complaint.

97.     The Fifth Amendment of the Constitution entitles plaintiffs to due process of law.

98.   Section 2(a) of the MREA denied the Hettingas' due process of law by foreclosing their ability to obtain effective judicial review of the Department of Agriculture's Final Rule in the <u>Johanns</u> litigation in the United States District Court for the Northern District of Texas.

99.   Section 2(a) of the MREA also denied plaintiffs due process of law by imposing mandatory statutory punishment upon the operation of their businesses.

100.   Section 2(a) of the MREA therefore violates the Due Process Clause of the Fifth Amendment.

## THIRD CLAIM FOR RELIEF

## (DENIAL OF EQUAL PROTECTION)

101.   Plaintiffs repeat and incorporate all previous allegations of this Complaint.

102.   The Fifth Amendment of the Constitution entitles plaintiffs to equal protection of the law.

103.   Section 2(a) of the MREA denies the Hettingas the equal protection of the laws by specifically singling them out for adverse treatment that is extended to no other producer-handler in any other Milk Marketing area.  The statute denies the Hettingas equal protection by imposing on them direct price controls and obligations to make pool payments that Congress has not imposed on any other producer-handler in the newly revised Arizona Milk Marketing area or on producer-handlers in any other Milk Marketing area in the country.

104.   Sections 2(a) and 2(b) of the MREA also deny the Hettingas' family partnership GH Processing equal protection of the laws by imposing Federal minimum price controls and an obligation to make pool payments on sales of milk into the California market that Congress has not imposed on any other handler in the nation, while simultaneously exempting Nevada handlers who sell milk into California from all Federal and State minimum price controls.

105.    The MREA denied the Hettingas equal protection of the laws by denying them, alone out of all the producer-handlers that were subjected to regulation under the Department of Agriculture's Final Rule, the ability to challenge that Rule in federal court.

106.    Further, the MREA denied the Hettingas equal protection of the laws because they alone have no effective remedy under the terms of the AMAA because the Secretary of Agriculture cannot change the MREA, nor decline to implement its terms or change the regulations implementing its terms with regard to the Hettingas.

107.    Section 2(a) of the MREA therefore violates the Equal Protection component of the Due Process Clause of the Fifth Amendment.

## SPECIFIC PRAYER FOR RELIEF

WHEREFORE, plaintiffs Hein and Ellen Hettinga d/b/a Sarah Farms and GH Dairy d/b/a/ GH Processing request the following relief:

1.    For a declaration that the Section 2(a) of the Act is unconstitutional, insofar as it purports to enact new Subsections (M) and (N) of Section 608c(5) of the AMAA.

2.    For an Order permanently enjoining the application of Subsections (M) and (N) of Section 608c(5) of the AMAA to GH Processing and to plaintiffs' Sarah Farms operation.

3.    For a declaration that Section 2(a) of the MREA constitutes an unconstitutional Bill of Attainder.

4.    For a declaration that Section 2(a) of the MREA violates plaintiffs' constitutional right to due process of law.

5.    For a declaration that Section 2(a) of the MREA violates plaintiffs' constitutional right to equal protection of the laws.

6.    For an Order mandating that the Secretary of Agriculture refund all assessments collected from GH Processing since May 1, 2006 and through the date of this Court's Order.

7.     For an Order mandating that the Secretary of Agriculture pay interest to GH Processing for all of the assessments collected from GH Processing at the highest rate permitted by law.

8.     For an Order awarding plaintiffs all of their costs and attorney's fees in prosecuting this action, and for such other and further relief as this Court deems just and appropriate under the circumstances.

### JURY DEMAND

Pursuant to Rule 38(b), <u>Federal Rules of Civil Procedure</u>, plaintiffs hereby demand a trial by jury, comprised of the maximum number of jurors permitted by law, on all issues triable of right by jury.

Respectfully submitted,

ALFRED W. RICCIARDI
(Arizona Bar No. 009547)
Aiken Schenk Hawkins & Ricciardi P.C.
4742 N. 24th Street, Suite 100
Phoenix, Arizona 85016
(602) 248-8203

November 18, 2008                    Counsel for Plaintiffs

S:\SarahFarms\2320301\District Court\15(B)Complaint-081118-Final.DOC

# EXHIBIT "A"

UNITED STATES DEPARTMENT OF AGRICULTURE

BEFORE THE SECRETARY OF AGRICULTURE

In re:                                    )       Docket No. AMA M-08-0069
                                          )
Hein Hettinga and Ellen Hettinga,         )
d/b/a Sarah Farms, and GH Dairy,          )
d/b/a GH Processing,                      )
                                          )
            Petitioners                   )       **Decision and Order**

## BACKGROUND

The Agricultural Marketing Agreement Act of 1937, as amended (7 U.S.C. §§ 601-674) [hereinafter the AMAA], empowers the Secretary of Agriculture to regulate persons who handle agricultural commodities, including milk, in order to establish and maintain orderly marketing conditions for those agricultural commodities, to protect consumers of agricultural commodities, and to avoid unreasonable fluctuations in supplies and prices by maintaining an orderly supply of agricultural products.[1]  The AMAA authorizes the Secretary of Agriculture to issue milk marketing orders to regulate geographic regions of the country.  Generally, pricing and pooling requirements established by federal milk marketing orders do not apply to entities that process their

---

[1] 7 U.S.C. § 602(1)-(2), (4).

2

own milk because these entities, which are referred to as "producer-handlers," are typically small and have little impact on the milk market.[2]

On February 24, 2006, the Administrator, Agricultural Marketing Service, United States Department of Agriculture [hereinafter the Administrator], issued a final rule amending the federal orders regulating the handling of "Milk in the Pacific Northwest Marketing Area" (7 C.F.R. pt. 1124 (2006)) and "Milk in the Arizona-Las Vegas Marketing Area" (7 C.F.R. pt. 1131 (2006)) to subject large producer-handlers in the two milk marketing areas to pricing and pooling obligations.[3]  As a result of that final rule, Hein Hettinga and Ellen Hettinga, d/b/a Sarah Farms, who operate a large dairy business in Arizona, were required to comply with the pricing and pooling obligations that applied to other dairy businesses in the Arizona-Las Vegas marketing area.

On April 11, 2006, Congress enacted the Milk Regulatory Equity Act of 2005 [hereinafter the MREA], which amended and supplemented the AMAA.[4]  The MREA

---

[2]*Edaleen Dairy, LLC v. Johanns*, 467 F.3d 778, 780 (D.C. Cir. 2006).  *See also Stew Leonard's v. Glickman*, 199 F.R.D. 48, 50 (D. Conn. 2001) (stating, typically, a producer-handler conducts a small family-type operation, processing, bottling, and distributing only his own farm production and the rationale for exempting the producer-handler from the pricing pool is that producer-handlers are so small that they have little or no effect on the pool), *aff'd*, 32 F. App'x 606 (2d Cir.), *cert. denied*, 537 U.S. 880 (2002).

[3]71 Fed. Reg. 9430 (Feb. 24, 2006).

[4]Section 2(a) of the MREA, Pub L. No. 109-215, 120 Stat. 328, 328-29, is codified at 7 U.S.C. § 608c(5)(M)-(O); section 2(b) of the MREA, Pub L. No. 109-215, 120 Stat. 328, 329, amends 7 U.S.C. § 608c(11)(C) and adds a new provision, 7 U.S.C. §

(continued...)

places volume limits on the applicability of the producer-handler exemption and requires

the Secretary of Agriculture to issue a final rule regulating the sale of fluid milk into

geographic regions with state-law minimum prices for milk by handlers located in

federally-regulated milk marketing areas.  Under this provision, milk handlers which

import milk into a region governed by state minimum milk prices shall be subject to all

the minimum and uniform price requirements of a federal milk marketing order

applicable to the county in which the plant of the handler is located.  On May 1, 2006, the

Secretary of Agriculture issued a final rule amending the 10 federal milk marketing orders

to implement the MREA.[5]  As a result of that final rule, GH Dairy, d/b/a GH Processing,

a partnership whose partners are Hein Hettinga, Ellen Hettinga, and Gerben Hettinga,

were required to comply with the pricing requirements of the Arizona marketing area.[6]

Hein Hettinga and Ellen Hettinga, d/b/a Sarah Farms, and GH Dairy, d/b/a GH

Processing [hereinafter the Hettingas], brought an action against the United States in the

---

[4](...continued)
608c(11)(D); and section 2(c)-(d) of the MREA, Pub L. No. 109-215, 120 Stat. 328, 330 is set forth in 7 U.S.C. § 608c note.

[5]71 Fed. Reg. 25,495 (May 1, 2006).

[6]Pursuant to the MREA, the Administrator removed Clark County, Nevada, from the Arizona-Las Vegas milk marketing area (71 Fed. Reg. 25,495, 25,502 (May 1, 2006)). Subsequently, the Administrator published a final rule changing the name of the federal milk marketing order from "Milk in the Arizona-Las Vegas Marketing Area" to "Milk in the Arizona Marketing Area" and changing the name of the milk marketing area from the "Arizona-Las Vegas marketing area" to the "Arizona marketing area" (71 Fed. Reg. 28,248, 28,249 (May 16, 2006)).

United States District Court for the District of Columbia: (1) asserting that the MREA

violates the Bill of Attainder Clause, the Due Process Clause, and the Equal Protection

Clause; (2) seeking a declaration that two provisions of the MREA are unconstitutional;

and (3) requesting the issuance of a permanent injunction against the application of the

MREA to them.

The United States moved to dismiss for lack of subject matter jurisdiction arguing

that the Hettingas' claims are barred because the Hettingas did not exhaust administrative

remedies available through petition to the Secretary of Agriculture. The AMAA

specifically provides that handlers may petition the Secretary of Agriculture for

modification of, or exemption from, an order, as follows:

> § 608c. Orders
> . . . .
> **(15) Petition by handler and review**
>
> (A) Any handler subject to an order may file a written petition with
> the Secretary of Agriculture, stating that any such order or any provision of
> any such order or any obligation imposed in connection therewith is not in
> accordance with law and praying for a modification thereof or to be
> exempted therefrom.

7 U.S.C. § 608c(15)(A).

On July 31, 2007, the United States District Court for the District of Columbia

issued a Memorandum Opinion: (1) finding the MREA requires an order by the Secretary

of Agriculture to be effective; (2) concluding, because the MREA cannot be implemented

as to the Hettingas without an order by the Secretary of Agriculture, any challenge to the

validity of the MREA is essentially a challenge to the order issued by the Secretary of

Agriculture; therefore, the mandatory exhaustion requirement of 7 U.S.C. § 608c(15)(A)

applies; (3) granting the motion to dismiss filed by the United States; and (4) dismissing

the case. *Hettinga v. United States*, 518 F. Supp.2d 58 (D.D.C. 2007).  The Hettingas

appealed to the United States Court of Appeals for the District of Columbia Circuit and

that appeal is currently pending.

## PROCEDURAL HISTORY

On March 7, 2008, the Hettingas instituted this administrative proceeding by filing

a Petition[7] pursuant to 7 U.S.C. § 608c(15)(A) and the Rules of Practice Governing

Proceedings on Petitions To Modify or To Be Exempted from Marketing Orders

(7 C.F.R. §§ 900.50-.71) [hereinafter the Rules of Practice].  The Hettingas allege the

MREA violates the Bill of Attainder Clause, the Due Process Clause, and the Equal

Protection Clause (Pet. ¶¶ 71-90) and seek a declaration that section 2(a) of the MREA is

unconstitutional (Pet. at 19-20).

On April 7, 2008, the Administrator filed "Answer of Respondent" in which the

Administrator:  (1) denies the material allegations of the Petition; (2) states the Petition

fails to state a claim upon which relief can be granted; (3) states the AMAA and the

federal order regulating "Milk in the Arizona Marketing Area" (7 C.F.R. pt. 1131), as

---

[7]The Hettingas entitle their Petition "Petition For Declaratory Relief From
Application Of The Milk Regulatory Equity Act And For Restitution" [hereinafter
Petition].

interpreted by the Administrator, are fully in accordance with law and binding on the

Hettingas; and (4) requests denial of the relief requested by the Hettingas and dismissal of

the Petition.

On July 15, 2008, the Hettingas filed a Motion for Judgment on the Pleadings:

(1) stating the Petition is a facial constitutional challenge to the MREA and the Secretary

of Agriculture has no authority to relieve the Hettingas from the operation of the MREA

and (2) requesting dismissal of the Petition and certification of the Hettingas' right to

have their claims reviewed by a court pursuant to 7 U.S.C. § 608c(15)(B).  On August 11,

2008, the Administrator filed a response to Petitioners' Motion for Judgment on the

Pleadings in which the Administrator requested dismissal of the Hettingas' Petition with

prejudice because the Hettingas failed to state a claim upon which relief can be granted.

On August 26, 2008, Administrative Law Judge Peter M. Davenport [hereinafter

the ALJ] issued a Memorandum Opinion and Order dismissing the Petition for failure to

state a claim upon which relief can be granted.  On September 26, 2008, the Hettingas

filed an "Appeal to the Judicial Officer and Request for Oral Argument" [hereinafter

Appeal Petition].  On October 15, 2008, the Administrator filed "Respondent's Response

to Appeal to the Judicial Officer and Request for Oral Argument."  On October 20, 2008,

the Hearing Clerk transmitted the record to the Judicial Officer for consideration and

decision.  On October 27, 2008, the Hettingas filed "Petitioners' Response To

Department Request To Decide This Petition Without Oral Argument."

## CONCLUSIONS BY THE JUDICIAL OFFICER

### The Hettingas' Appeal Petition

The Hettingas state their Petition presents only a facial constitutional challenge to the MREA, and the statutory provision under which the Hettingas instituted the instant administrative proceeding, 7 U.S.C. § 608c(15)(A), is not applicable to this facial constitutional challenge (Appeal Pet. at 2). Moreover, the Hettingas agree with the ALJ's legal conclusion that the Secretary of Agriculture cannot provide the relief requested by the Hettingas (Appeal Pet. at 1). The Administrator states that the Hettingas' facial constitutional challenge to the MREA is a claim that cannot be raised administratively and urges, in his response to the Hettingas' Appeal Petition, that I affirm the ALJ's Memorandum Opinion and Order dismissing the Hettingas' Petition.

I agree with the Hettingas, the Administrator, and the ALJ. The Hettingas' March 7, 2008, Petition fails to state a claim upon which relief may be granted in this forum. Therefore, I affirm the ALJ's August 26, 2008, Memorandum Opinion and Order and dismiss the Hettingas' March 7, 2008, Petition with prejudice.

### The Hettingas' Request for Oral Argument

The Hettingas' request for oral argument before the Judicial Officer, which the Judicial Officer may grant, refuse, or limit,[8] is refused because the parties have

---

[8] 7 C.F.R. § 900.65(b)(1).

thoroughly briefed the issues and the issues are not complex.  Thus, oral argument would serve no useful purpose.

### The Hettingas' Reply to the Administrator's Response
### to the Hettingas' Appeal Petition and Request for Oral Argument

On October 27, 2008, the Hettingas filed a reply to the Administrator's response to the Hettingas' Appeal Petition and the Hettingas' request for oral argument.  The Rules of Practice do not provide for a reply to a response to an appeal petition or for a reply to a response to a request for oral argument, and the Hettingas did not request the opportunity to file such a reply.  Therefore, I strike the Hettingas' October 27, 2008, supernumerary filing.

For the forgoing reasons, the following Order is issued.

### ORDER

The Hettingas' March 7, 2008, Petition is dismissed with prejudice for failure to state a claim upon which relief may be granted.

Done at Washington, DC

October 30, 2008

William G. Jenson
Judicial Officer