1  TONY WEST
   Assistant Attorney General
2  JOHN R. GRIFFITHS
   Assistant Branch Director
3  PETER J. PHIPPS (DC Bar No. 502904)
   Trial Attorney
4  United States Department of Justice
   Civil Division, Federal Programs Branch
5  Tel: (202) 616-8482
   Fax: (202) 616-8470
6  peter.phipps@usdoj.gov
   Attorneys for Defendants
7
                    UNITED STATES DISTRICT COURT
8
                        DISTRICT OF ARIZONA
9

10  HEIN HETTINGA, et al.,

11              Plaintiffs,                    CIV-08-2124-PHX-FJM

12        v.
                                        **DEFENDANTS' MEMORANDUM
13  EDWARD T. SCHAFER, et al.,          IN SUPPORT OF MOTION TO
                                        DISMISS**
                Defendants.
14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**INTRODUCTION**

Plaintiffs, Hein and Ellen Hettinga d/b/a Sarah Farms and GH Dairy d/b/a GH Processing, seek to have this Court strike down as unconstitutional two provisions of the Milk Regulatory Equity Act of 2006, Pub. L. No. 109-215, 120 Stat. 328 (Apr. 11, 2006) (the "MREA"). Plaintiffs' complaint targets section 2(a) of the MREA, specifically subsections (M) and (N). These subsections narrow the exceptions to pooling and pricing obligations that would otherwise apply to handlers of milk products. By closing these loopholes, the MREA ensures that the largest entities in the dairy industry are not exempted from regulation. Subsection (M) subjects a handler of milk products to federal pool payment obligations when that handler sells milk from a federally regulated geographic area into an area where milk sales are regulated at the state level. Similarly, subsection (N) applies a cap of three million pounds of milk per month to the Arizona geographical region, thus ensuring that any handler whose production exceeds that limit is subject to the applicable federal pooling obligations. Plaintiffs, who were previously unregulated, complain that through these two subsections, the MREA violates the Bill of Attainder Clause, the Equal Protection Clause, and the Due Process Clause. Plaintiffs mistake valid regulatory statutes for constitutional infirmities. Their claims lack merit and should be dismissed.[1]

**STATUTORY AND REGULATORY BACKGROUND**

**I.      The Federal Regulation of Milk**

Through the Agricultural Marketing Agreement Act of 1937 as amended, see 7 U.S.C. § 601 et seq. (the "AMAA"), Congress empowered the Secretary of Agriculture to regulate

---

[1]  As set forth in the parties' April 9, 2009 Joint Motion to Stay All Proceedings (Docket #16), the parties moved to stay this lawsuit in light of the pending, first-filed action brought by these same plaintiffs, involving the same issues, in the District of Columbia. The Court, however, has denied that motion, and defendants therefore move to dismiss on the grounds set forth herein. Defendants asserted these same dismissal arguments in the District of Columbia litigation, but the court there did not reach them because it ruled instead that plaintiffs were required to exhaust administrative remedies. The D.C. Circuit reversed that ruling on exhaustion, see Hettinga v. United States, No. 07-5403, 2009 WL 875325, at *6 (D.C. Cir. Apr. 3, 2009), and defendants are considering whether to seek further review. If the panel decision of the D.C. Circuit stands, plaintiffs have indicated they will voluntarily dismiss this action and proceed with their first-filed action in the District of Columbia. See Joint Mot. to Stay All Proceedings, at 2.

persons who handle agricultural commodities, including milk products. See id. § 608c(1)-(2). Congress authorized the regulation of such persons, known as "handlers," through agricultural marketing orders to further several policy objectives, including establishing and maintaining orderly marketing conditions for agricultural commodities, see id. § 602(1), protecting consumers of agricultural commodities, see id. § 602(2), as well as avoiding unreasonable fluctuations in supplies and prices by maintaining an orderly supply of agricultural products throughout the seasons, see id. § 602(4).

With regard to milk, the AMAA authorizes the Secretary of Agriculture to establish milk marketing orders to regulate different geographic regions of the country. See id. §§ 608c(1), (5). This authority includes the ability to guarantee dairy farmers (referred to as "producers") a minimum uniform price for milk sold to handlers, regardless of the milk's ultimate use. Id. §§ 608c(5)(A)-(C). Pursuant to the AMAA, the Secretary of Agriculture has issued several milk marketing orders for many geographic regions of the United States, including Order 131, which governs the Arizona geographic region. See, e.g., 7 C.F.R. §§ 1131.1 -.86 (providing regulations specific to Order 131).

On the handler side, a 'pool' or 'settlement fund' is created to take into account the end use of milk purchased at the blend price. See 7 C.F.R. § 1000.70 (providing for the settlement fund). Handlers pay into the settlement fund to the extent that the average end-use value of their milk products exceeds the blend price. See Lehigh Valley Farmers v. Block, 829 F.2d 409, 412 (3d Cir. 1987); Schepps Dairy, Inc. v. Bergland, 628 F.2d 11, 15 (D.C. Cir. 1979); see, e.g., 7 C.F.R. § 1131.71 (providing for handler payments into the settlement fund for Order 131). Handlers whose average end-use value of their milk products is below the blend price receive payments from the settlement fund. See Lehigh Valley, 829 F.2d at 412; Schepps Dairy, 628 F.2d at 15; see, e.g., 7 C.F.R. § 1131.72 (providing for payments to handlers from the settlement fund for Order 131). The net effect of these payments is that "each handler pays for his milk at the price he would have paid had it been earmarked at the outset for the use to which it was ultimately put." Lehigh Valley Coop. Farmers, Inc. v. United States, 370 U.S. 76, 81 (1962); see also 7 U.S.C. § 608c(5)(C) (requiring that "the

2

1  total sums paid by each handler shall equal the value of milk purchased by him at the prices

2  fixed . . ."); Lamers Dairy Inc. v. USDA, 379 F.3d 466, 470 (7th Cir. 2004).

3  **II.      Exceptions to the Pooling and Pricing Obligations**

4  Before the MREA, there were two loopholes that would allow even the largest

5  handlers to avoid the pooling and pricing obligations.  First, when a handler located in a

6  federally regulated marketing order sold milk into an area subject to state regulation, those

7  sales were exempt from federal (and state) pool payment obligations.  Second, where a

8  handler's operations were so thoroughly integrated with the production side that the entire

9  business – from cow to consumer – did not rely on federal minimum price guarantees, it was

10 exempt from the pooling and pricing obligations.  See Edaleen Dairy, LLC v. Johanns, 467

11 F.3d 778, 780 (D.C. Cir. 2006).  Historically, the entities qualifying for this so-called

12 producer-handler exception were small family businesses, and their use of the exception did

13 not disrupt orderly milk market conditions.  See id.; Stew Leonard's v. Glickman, 199 F.R.D.

14 48, 50 (D. Conn. 2001).  In recent years, however, the allure of the competitive advantage

15 from the producer-handler exception (not having to make payments to the settlement fund)

16 has motivated entities with large-scale dairy operations to exploit the exception.  See Edaleen

17 Dairy, 467 F.3d at 780.

18 **III.     The February 2006 Amendments to USDA Regulations for Order 131**

19 In February 2006, the Secretary of Agriculture redefined the producer-handler

20 exception for Order 131 so that large producer-handlers are no longer exempt from the

21 Order's pooling and pricing requirements.  See *Milk in the Pacific Northwest and Arizona-*

22 *Las Vegas Marketing Areas; Order Amending the Orders*, 71 Fed. Reg. 9430 (Feb. 24,

23 2006).  Under the amended regulatory definition, handlers with in-area monthly milk

24 distributions of over three million pounds no longer qualify as exempt producer-handlers.

25 71 Fed. Reg. at 9433, Part 3 (codified at 7 C.F.R. § 1131.10).  As a result, large producer-

26 handlers in Arizona are now subject to the same pooling and pricing requirements that apply

27 to all handlers.  See 71 Fed. Reg. at 9430.

28 Before implementing such a rule, USDA issued a proposed rule, heard testimony, and

3

1   made findings regarding the need and appropriateness of amending the producer-handler

2   exception for Order 131.   See *Milk in the Pacific Northwest and Arizona-Las Vegas*

3   *Marketing Areas; Final Decision on Proposed Amendments to Marketing Agreement and to*

4   *Orders*, 70 Fed. Reg. 74166-91 (Dec. 14, 2005).   As a result of that process, USDA

5   concluded that contrary to the AMAA's goal of achieving orderly milk markets, an uncapped

6   producer-handler exception in the Arizona region was contributing to significant market

7   instability.   See 70 Fed. Reg. at 74185-86; see also id. at 74188 ("This decision finds that

8   disorderly marketing conditions exist in the Pacific Northwest and the Arizona-Las Vegas

9   marketing areas.").[2]

10   In addition to these findings on the disruptive effects of an uncapped producer-handler

11   exception, USDA also concluded that a central rationale underlying the producer-handler

12   exception no longer applied to the large producer-handlers.   A justification for exempting

13   producer-handlers from the pooling and pricing requirements was that they bore the burden

14   of disposing of their surplus milk – milk that they processed, but could not sell as fluid milk.

15   But, that rationale ceases to exist for large producer-handlers because by not having to pay

16   into the settlement fund, they can price their milk so that all of it can be sold as highly

17   profitable fluid milk.   See 70 Fed. Reg. at 74187.   Thus, USDA found that the competitive

18   advantage from the producer-handler exception is so great that it allows large producer-

19   handlers to avoid the risks traditionally associated with producer-handler status.

20   **IV.   The Milk Regulatory Equity Act of 2006**

21   Enacted on April 11, 2006, the MREA amends and supplements the AMAA by

22   limiting the two exceptions to the pooling and pricing obligations.   See Pub. L. No. 109-215,

23   120 Stat 328 (Apr. 11, 2006).   Those limits are contained in MREA, Section 2(a), subsections

24   (M) and (N), which are now codified at 7 U.S.C. § 608c(5)(M)-(N).

25   Subsection (M) regulates the sale of fluid milk into geographic regions with state-law

26

27       [2]   USDA concluded that the evidence before it would have supported a decision to
phase out the producer-handler exception at an even lower monthly milk volume – 150,000
28   pounds – one-twentieth of the current three-million pound cap.   See 70 Fed. Reg. at 74186.

minimum prices for milk (such as California) by handlers located in regions covered by federally regulated milk marketing orders (such as Arizona).   In general, under subsection (M), milk handlers who import milk into a region governed by state minimum milk prices "shall be subject to all of the minimum and uniform price requirements of a Federal milk marketing order . . . applicable to the county in which the plant of the handler is located . . . ." 7 U.S.C. § 608c(5)(M)(i).  Thus, under subsection (M), handlers can no longer avoid the pooling and pricing obligations of their own federal marketing order (as well as those of the state into which the sales take place) by selling milk from a region that is federally regulated into a region that is regulated at the state level.  See id. § 608c(5)(M)(ii).

Subsection (N) regulates milk handlers in Order 131.  Under subsection (N), handlers (including producer-handlers) with a monthly disposition of over three million pounds of Class I milk products from their own farms are subject to the minimum pooling and pricing requirements.  See 7 U.S.C. § 608c(5)(N).

### STATEMENT OF THE CASE

Plaintiffs Sarah Farms and GH Processing claim that subsections (M) and (N) of the MREA violate the Constitution.  Under the MREA, plaintiffs are presently subject to the pooling and pricing obligations for federally regulated milk handlers.  Before the enactment of subsection (M), plaintiff GH Processing avoided the federal (and state) pooling and pricing obligations because although GH Processing was located within Order 131, its sales were from a federal marketing order into a state-regulated area.  Similarly, before the enactment of subsection (N), plaintiff Sarah Farms relied on a limitless producer-handler exception to avoid the pooling and pricing obligations.  Due to the volume limit on the produce-handler exception imposed by subsection (N), whenever Sarah Farms exceeds monthly fluid milk dispositions of three million pounds a month, it will be subject to the same pooling and pricing obligations as other regulated handlers in Order 131.  As explained below, the MREA is constitutional, and plaintiffs' case should be dismissed.

1

**ARGUMENT**

2

**I.    Plaintiff Sarah Farms' Action Must Be Dismissed Pursuant to Rule
3          12(b)(1) for Lack of Subject Matter Jurisdiction.**

4          **A.    Standard of Review for Rule 12(b)(1) Dismissal**

5          Federal Rule of Civil Procedure 12(b)(1) allows for a preliminary challenge to a

6   court's subject matter jurisdiction over an action.  Because federal courts are courts of

7   limited jurisdiction, it is presumed that a plaintiff's action lies outside of that jurisdiction.

8   See Kokkonen v. Guardian Life Ins. Co. of Am., 511 U.S. 375, 377 (1994).  For that reason,

9   a plaintiff bears the burden of establishing jurisdiction, which includes proving the elements

10  of Article III standing (an injury-in-fact, traceability, and redressability).  See Lujan v.

11  Defenders of Wildlife, 504 U.S. 555, 560-61 (1992).  A court's standing inquiry is

12  "especially rigorous when reaching the merits of the dispute would force [the court] to decide

13  whether an action taken by one of the other two branches of the Federal Government was

14  unconstitutional."  Raines v. Byrd, 521 U.S. 811, 819 (1997).  Where a plaintiff does not

15  establish standing to bring a claim, a court must dismiss that claim for lack of subject matter

16  jurisdiction. See Valley Forge Christian Coll. v. Americans United for Separation of Church

17  and State, Inc., 454 U.S. 464, 475-76 (1982) ("Those who do not possess Article III standing

18  may not litigate as suitors in the courts of the United States.").

19          **B.    Plaintiff Sarah Farms Lacks Standing to Challenge Subsection (N).**

20          Plaintiff Sarah Farms does not have Article III standing to challenge the

21  constitutionality of subsection (N) because it cannot satisfy the traceability and redressability

22  requirements.  See Lujan, 504 U.S. at 560.  This is so because the USDA regulations, *which*

23  *Sarah Farms does not challenge in this litigation*, independently impose a three million

24  pound monthly output cap on the producer-handler exception, see 71 Fed. Reg. at 9433, Part

25  3 (codified at 7 C.F.R. § 1131.10) (excluding handlers with a monthly distribution of over

26  three million pounds from the definition of "producer-handler").

27          Due to this independent basis for the cap on the producer-handler exception, Sarah

28  Farms' challenges to the constitutionality of subsection (N) fail the fairly traceable and

6

redressability elements of standing.  To prove the traceability requirement, plaintiffs must demonstrate a "fairly traceable" causal connection between the alleged injury and the challenged action, and the injury must not result from another independent action not before the court.  See Lujan, 504 U.S. at 560.  Yet, here, Sarah Farms' alleged injury (the cap on the producer-handler exception) would also result from the preexisting USDA regulations.  See 71 Fed. Reg. at 9433, Part 3 (codified at 7 C.F.R. § 1131.10).  For that reason, Sarah Farms cannot fairly trace its injuries back to only subsection (N), and consequently, it lacks standing.  Nor is Sarah Farms' injury redressable.  Redressability requires that a plaintiff demonstrate that the requested relief would likely redress the alleged injury.  See Lujan, 504 U.S. at 560-61.  Here, even if subsection (N) were declared a nullity, Sarah Farms would still be subject to the three million pound monthly cap on the producer-handler exception, again due to the USDA regulations.  See 71 Fed. Reg. at 9433, Part 3 (codified at 7 C.F.R. § 1131.10).  In sum, due to the independent force of the USDA regulations, Sarah Farms cannot satisfy the traceability and redressability elements of Article III standing.

## II.     Plaintiffs' Complaint Does Not State a Cognizable Claim for Relief.

Plaintiffs attack the MREA on several constitutional grounds.  Even taking plaintiffs' factual allegations as true, they do not state a claim upon which relief can be granted.

### A.     Standard of Review for a Rule 12(b)(6) Motion to Dismiss

Federal Rule of Civil Procedure 12(b)(6) provides a mechanism for testing the legal sufficiency of the factual allegations in a plaintiff's complaint.  See Davis v. Monroe County Bd. of Educ., 526 U.S. 629, 633 (1999).  Dismissal for failure to state a claim "can be based on the lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory."  Balistreri v. Pacifica Police Dep't, 901 F.2d 696, 699 (9th Cir.1990).  The factual allegations set forth in the complaint must be sufficient "to raise a right to relief above the speculative level."  Bell Atl. Corp. v. Twombly, 127 S. Ct. 1955, 1965 (2007).  Moreover, the Rule 12(b)(6) pleading standard applies only to factual allegations, and does not apply to "legal conclusions cast in the form of factual allegations."  Kowal v. MCI Commc'ns Corp., Inc., 16 F.3d 1271, 1275 (D.C. Cir. 1994).

7

**B.**     **Section 2(a) of the MREA Is Not a Bill of Attainder.**

Section 2(a) of the MREA, which contains subsections (M) and (N), is not a bill of attainder.  The Supreme Court has described the "key features" of a bill of attainder as being "a law that legislatively determines guilt and inflicts punishment upon an individual without the provisions of a judicial trial."  Nixon v. Adm'r of Gen. Servs., 433 U.S. 425, 468 (1977); see also SeaRiver Mar. Fin. Holdings, Inc. v. Mineta, 309 F.3d 662, 668-69 (9th Cir. 2002).  Section 2(a) does not satisfy any of those elements.  It does not target a sufficiently specific person or group, let alone plaintiffs.  It does not inflict a punishment.  Nor does it legislatively determine plaintiffs' guilt.  Nor does it deny plaintiffs the provisions of a judicial trial.  Rather, section 2(a) is a legitimate form of economic regulation in furtherance of orderly and stable milk markets by treating plaintiffs the same as other handlers.

**1.**     **Section 2(a) Does Not Satisfy the Specificity Element of a Bill-of-Attainder Violation.**

Subsections (M) and (N) of the MREA do not satisfy the specificity element of the bill of attainder analysis.  Under Supreme Court jurisprudence, the specificity element is not satisfied when either of two conditions is met: (i) the legislation is open-ended in its applicability; or (ii) the legislation governs conditions within a person's control, as opposed to immutable characteristics.  See Nixon, 433 U.S. at 471-72; Communist Party of the United States. v. Subversive Activities Control Bd., 367 U.S. 1, 86 (1961); Am. Commc'ns Ass'n, C.I.O. v. Douds, 339 U.S. 382, 414 (1950).  Both of those conditions exist here – subsections (M) and (N) are open-ended (other entities meeting the conditions would be subject to their terms), and they do not regulate based on conditions beyond plaintiffs' present control, such as past conduct (plaintiffs can change their business practices to avoid regulation).

At the outset, it is of no legal significance that subsections (M) and (N) may presently apply only to plaintiffs because subsections (M) and (N) are open-ended in their applicability.  The Supreme Court's Nixon decision makes clear this point of law.  There, the Supreme Court considered and rejected the argument that the specificity prong could be

8

satisfied when a statute presently applies only to one person or entity.  <u>Nixon</u> 433 U.S. at
471-72; <u>see also</u> <u>Communist Party</u>, 367 U.S. at 88.  In so doing, the Court explained that
although the statute at issue, the Presidential Recordings and Materials Preservation Act,
applied at that time only to President Nixon's files, the statute was open-ended and would
apply to the files of future presidents, and for that reason, it was not a bill of attainder.  <u>Id.</u>
at 472; <u>see also</u> <u>United States v. Brown</u>, 381 U.S. 437, 461 (1965) (explaining that rules of
general applicability do not constitute bills of attainder).  The same is true of subsections (M)
and (N); they can apply to an unlimited number of additional handlers who would sell from
federally regulated areas into state-regulated areas or who would have monthly route
dispositions of over three million pounds of milk.  Due to that open-ended nature, the
MREA, like the statute at issue in <u>Nixon</u>, is not a bill of attainder.  <u>See</u> <u>Kerr-McGee Chem.</u>
<u>Corp. v. Edgar</u>, 837 F. Supp. 927, 936 (N.D. Ill. 1993) (explaining that legislation that "could
potentially operate on other entities" was not a bill of attainder "even if as it now stands the
Act operates only upon [plaintiff]"); <u>see also</u> <u>Cathy's Tap, Inc. v. Vill. of Mapleton</u>, 65 F.
Supp. 2d 874, 881-82 (C.D. Ill. 1999).

Next, subsections (M) and (N) are not bills of attainder because they do not impose
penalties by name or based on an irreversible characteristic (such as past conduct).  <u>See</u>
<u>Communist Party</u>, 367 U.S. at 86 (explaining that the Subversive Activities Control Act is
not a bill of attainder because "it attaches not to specified organizations but to described
activities in which an organization may or may not engage").  More practically still, Sarah
Farms could avoid the volume limit imposed by subsection (N) entirely by lowering its
monthly fluid milk output.  <u>See</u> <u>Am. Commc'ns Ass'n</u>, 339 U.S. at 414 (1950) (holding that
the law at issue was not a bill of attainder because the persons subject to it could by
"voluntary alteration" avoid its effect); <u>WMX Techs., Inc. v. Gasconade County, Mo.</u>, 105
F.3d 1195, 1202 (8th Cir. 1997); <u>Recreational Devs. of Phoenix, Inc. v. City of Phoenix</u>,
83 F. Supp. 2d 1072, 1098 (D. Ariz. 1999) (holding that local ordinance prohibiting certain
adult businesses was not a bill of attainder since the ordinance "does not mention Plaintiffs
by name, nor does it limit its application to Plaintiffs or deny them the opportunity to

1   conform their conduct to the new ordinance").

2       In sum, subsections (M) and (N) do not meet the specificity element for a bill of

3   attainder because they are of general applicability and do not apply to a closed set of persons,

4   either by name or based on an immutable characteristic.  Rather, section 2(a) regulates

5   prospective economic conduct, and thus does not impermissibly punish persons based on

6   conditions beyond their control.

7       **2.    Section 2(a) of the MREA Does Not Inflict a Legislative Punishment.**

8       In evaluating whether legislation constitutes a punishment for bill-of-attainder

9   purposes, courts have considered three factors: whether the legislation fits into the historical

10  definition of a punishment (the historical test); whether the legislation acts like a punishment

11  (the functional test); and whether the legislation was motivated by punitive interests (the

12  motivational test).  See Selective Serv. Sys. v. Minn. Pub. Interest Research Group, 468 U.S.

13  841, 852 (1984); SeaRiver, 309 F.3d at 673.  Section 2(a) does not satisfy any of those tests,

14  and therefore it is not a legislative punishment.  It is, instead, regulatory legislation of an

15  economic market.

16      **a.    Historical Analysis of Punishment**

17      The MREA does not constitute a bill of attainder under the historical analysis of

18  punishment for three reasons: (i) the MREA is a classic economic regulation since it governs

19  actions, not persons; (ii) plaintiffs have the ability to avoid the effects of the MREA by

20  altering their business operations; and (iii) the MREA does not condemn plaintiffs or subject

21  them to a public reprimand.

22      First, the MREA is economic legislation, not punishment.  As the Supreme Court

23  explained, "Forbidden legislative punishment is not involved merely because the Act

24  imposes burdensome consequences."  Nixon, 433 U.S. at 472.  The historical sense of

25  punishment has also been distinguished from that of regulation by the following hypothetical:

26          For example, it would be patently absurd, we think, for an inorganic chemical
            company to argue that because it must comply with environmental laws
27          specific to that industry, Congress has "punished" it in violation of the bill of
            attainder clause.  Leaving aside the nonpunitive purpose of such laws, it is
28          clear that the environmental laws perpetually leave open the possibility that the

company may still manufacture lawful products by simply employing the appropriate pollution control techniques or devices.

BellSouth Corp. v. Fed. Commc'ns Comm'n, 162 F.3d 678, 685 (D.C. Cir. 1998).  As this example underscores, congressional regulation of an industry – even through strict compliance laws – is not within the historical meaning of a bill of attainder.  Consequently, because section 2(a) works to regulate the milk industry in the Arizona region, as well as milk sales into non-federally regulated regions, it is a regulation and not a punishment.

Second, where there is a possibility that a statute will not impose adverse consequences on an entity, then that statute does not satisfy the punishment element.  See Selective Serv. Sys., 468 U.S. at 853 (holding that a statute that leaves open "perpetually the possibility" that its effect can be avoided does not fall within the historical definition of punishment).  As the Supreme Court explained in upholding legislation that terminated social security benefits for deported aliens against a bill-of-attainder challenge:

> Where the source of legislative concern can be thought to be the ***activity or status*** from which the individual is barred, the disqualification is not punishment even though it may bear harshly upon one affected.  The contrary is the case where the statute in question is evidently aimed at the person or class of persons disqualified.

Fleming v. Nestor, 363 U.S. 603, 614 (1960) (emphasis added).  Consistent with the Supreme Court's conclusion that legislation which focuses on conduct or status and not on persons specifically is not punishment, section 2(a) focuses on actions and not on persons *qua* persons.  For instance, as explained above, the impact of subsection (N) can be avoided by any handler simply by not selling over three million pounds of fluid milk a month.  In short, section 2(a) regulates conduct, and it does not satisfy the historical definition of punishment.

Finally, where legislation does not censure or condemn a person, that legislation is not within the historical definition of punishment for bill-of-attainder purposes.  See United States v. Brown, 381 U.S. 437, 453-54 (1965); Foretich v. United States, 351 F.3d 1198, 1220 (D.C. Cir. 2003) ("While the prohibition against bills of attainder has evolved far beyond the original context of capital sentences, it continues to focus on legislative enactments that 'set a note of infamy' on the persons to whom the statute applies." (quoting

11

Brown, 381 U.S. at 453-54.)).  Section 2(a) does not contain any legislative censure or public reprimand, and so again, it falls outside of the historical meaning of legislative punishment.

### b.      Functional Analysis of Punishment

Subsections (M) and (N) of the MREA do not function as a punishment, but rather as economic pooling regulations, common in the milk industry since the 1930s.  The purposes of the MREA are to ensure orderly marketing conditions and to promote regulatory equity. Because Congress may legitimately act to further those purposes, the MREA constitutes valid economic regulation and not a punishment.  See SeaRiver, 309 F.3d at 674 ("[E]ven if the Act singles out an individual on the basis of irreversible past conduct, if it furthers a non-punitive purpose, it is not a bill of attainder."); see also N. Am. Co. v. Sec. & Exch. Comm'n, 327 U.S. 686, 706 (1946) ("Once it is established that the evil concerns or affects commerce in more states than one, Congress may act."); SBC Commc'ns, Inc. v. Fed. Commc'ns Comm'n, 154 F.3d 226, 243 (5th Cir. 1998) (concluding that ensuring fair competition is a non-punitive purpose).

By narrowing the exceptions to the pooling and pricing obligations, the MREA eliminates means by which handlers could obtain a competitive advantage at the expense of regulated handlers (who still have to make pool payments) and other producers (who receive a lower guaranteed blend price).  Subsection (M) ensures that handlers who sell milk from federally regulated regions into state-regulated regions are responsible for the federal pool payments.  See 70 Fed. Reg. 74166, 74187.  Similarly, subsection (N) addresses disruptive marketing conditions in Order 131, wherein the exploitation of the producer-handler exception reduced the blend price to dairy farmers in Arizona, causing them a significant loss of revenue.  See Fed. Reg. 74166, 74186.  In sum, by eliminating or capping the loopholes, the MREA furthers the legitimate, non-punitive objectives of promoting market stability and furthering regulatory equity.

### c.      Motivational Analysis of Punishment

As the Supreme Court has observed, the search for punitive legislative motives is often wrought with peril:

12

1
2
3
4
5

> We observe initially that only the clearest proof could suffice to establish the unconstitutionality of a statute on such a ground [i.e., punitive design]. Judicial inquiries into Congressional motives are at best a hazardous matter, and when that inquiry seeks to go beyond objective manifestations it becomes a dubious affair indeed. Moreover, the presumption of constitutionality with which this enactment, like any other, comes to us forbids us lightly to choose that reading of the statute's setting which will invalidate it over one that will save it.

6   Fleming, 363 U.S. at 617; see also Selective Serv. Sys., 468 U.S. at 856 n.15 (requiring

7   "unmistakable evidence of punitive intent" by Congress before a statute may be invalidated

8   on attainder grounds (quoting Fleming, 363 U.S. at 619)).

9       Here, however, the text of the MREA does not express any intention of punishing

10   plaintiffs. See Pub. L. No. 109-215, 120 Stat 328, 328  (Apr. 11, 2006) (expressing the

11   purpose of ensuring regulatory equity). Moreover, there were no committee reports or floor

12   speeches in the Senate. Thus, the only other source of legislative history – floor debates in

13   the House of Representatives – could, by itself, hardly suffice to establish such "clearest

14   proof."   See Navegar, Inc. v. United States, 192 F.3d 1050, 1067 (D.C. Cir. 1999)

15   (concluding that although appellants "are repeatedly named in the floor debates . . . . these

16   allegations fall well short of the type of evidence required to show a legislative intent to

17   punish").

18       An examination of the floor statements in the House puts the matter to rest because

19   those statements evidence no legislative intent to punish. Rather, the floor statements

20   indicate that the MREA was enacted to promote orderly milk markets and to ensure

21   regulatory equity by closing loopholes. See 152 Cong. Rec. H1149, H1152 (daily ed. Mar.

22   28, 2006) (statement of Rep. Goodlatte) (explaining that "[t]his is not about punishing

23   individuals.  It is about ensuring a level playing field for competition."); id. at 1154

24   (statement of Rep. Nunes) ("This has national implications to let producer-handlers game the

25   system.  This is about gaming the system."); see also 152 Cong. Rec. H1149, H1150-51

26   (daily ed. Mar. 28, 2006) (statement of Rep. Goodlatte); id. at H1152 (statement of Rep.

27   Cardoza); id. at H1152 (statement of Rep. Schmidt); id. at H1153 (statement of Rep.

28   Gutknect); id. at H1152-53 (statement of Rep. Costa).  None of these floor statements

constitutes the "clearest proof" of a legislative intent to punish.  To the contrary, they evidence a concern for regulatory equity and a desire to close loopholes that disrupt orderly milk markets, which again confirms that section 2(a) is not a bill of attainder.

**3.      Section 2(a) of the MREA Does Not Usurp the Judicial Function.**

As its third element, the bill of attainder prohibition prevents legislatures from usurping judicial functions in two ways:  by making a legislative determination of guilt or by denying judicial recourse.  See Nixon, 433 U.S. at 468; Brown, 381 U.S. at 454 n. 29; Lovett, 328 U.S. at 322-23 (Frankfurter, J., concurring); Cummings v. Missouri, 71 U.S. 277, 323 (1866); see generally SeaRiver, 309 F.3d at 668 ("The Bill of Attainder Clause implements the doctrine of separation of powers"); Siegel v. Lyng, 851 F.2d 412, 416 (D.C. Cir. 1988) (explaining the separation of powers rationale for bill of attainder prohibition). Neither of those is present here.

First, the MREA makes no legislative determination of guilt because it does not determine that plaintiffs possess certain characteristics at issue.  The MREA does not identify GH Processing as selling milk from a federally regulated region into a state-regulated area. Nor does it find that Sarah Farms had monthly distributions of more than three million pounds of fluid milk.  Similarly, the MREA does not indicate that plaintiffs are guilty or liable for some past offense.  Nor is there any link between the present regulation and plaintiffs' past practices.  Thus, the MREA does not legislatively determine guilt.

Second, section 2(a) is not a bill of attainder because it does not deny plaintiffs the ability to seek judicial recourse.  See Cummings, 71 U.S. at 323 ("A bill of attainder is a legislative act which inflicts punishment without a judicial trial.").  Nothing in section 2(a) operates to prevent plaintiffs (or other persons with fluid milk distribution of over three million pounds a month) from having recourse to the judiciary.

**C.      The MREA Does Not Violate Equal Protection or Due Process.**

Plaintiffs' remaining equal protection and due challenges to subsections (M) and (N) are evaluated under rational basis review, which they easily pass.  See Heller v. Doe, 509 U.S. 312, 320 (1993); Merrifield v. Lockyer, 547 F.3d 978, 989 (9th Cir. 2008); see also

14

1    Lamers Dairy Inc. v. USDA, 379 F.3d 466, 476 (7th Cir. 2004) ("In cases involving

2    economic or social regulation, so long and distinctions are conceivably rational, the recourse

3    of a disadvantaged entity lies in the democratic process.").   Both subsections rationally

4    further the legitimate government interests in maintaining orderly milk marketing conditions

5    and promoting regulatory equity because unregulated milk distribution disrupts stable and

6    orderly milk marketing.  Nor are these subsections mandatory statutory punishments that lack

7    effective remedies, after all, their effects can be avoided.

8           Subsection (M) promotes orderly markets and regulatory equity by regulating handlers

9    who would export fluid milk into non-federally regulated regions.  Excluding such handlers

10    from the pooling and pricing obligations would provide them with a competitive advantage

11    over their regulated rivals in two regions – in their own federal marketing order as well as

12    in the state-regulated region into which they sell milk.  See 70 Fed. Reg. at 74187.  By

13    preventing such exportation of milk without the corresponding obligation to make pool

14    payments, subsection (M) promotes regulatory equity and orderly markets.  Consequently,

15    plaintiffs cannot meet their burden of establishing that subsection (M) is irrational in every

16    reasonably conceivable instance, and subsection (M) must be upheld as constitutional.

17           Subsection (N) also works to achieve orderly milk markets and regulatory equity.  By

18    requiring handlers in Order 131 with monthly milk distributions of over three million pounds

19    to make pool payments, subsection (N) eliminates the producer-handler exception for large

20    handlers.   As explained above, when large handlers are exempted from the pooling

21    requirements of Order 131, they have a significant competitive advantage over other

22    handlers, and their non-regulated sales dramatically reduce the blend price for dairy farmers

23    in Arizona.  See 70 Fed. Reg. at 74186.  To prevent such destabilizing effects on the milk

24    market, subsection (N) no longer permits these large handlers to be exempt from pool

25    payments.  For that reason, subsection (N) is a rational means of promoting an orderly and

26    stable milk market in Order 131.

27           In short, subsections (M) and (N) survive rational basis review, and thus plaintiffs do

28    not state a claim under the Due Process Clause or the Equal Protection Clause.

1

**CONCLUSION**

2

      For the foregoing reasons, the Court should dismiss this action.

3

4   Dated: May 6, 2009                   Respectfully submitted,

5                                TONY WEST
                                Assistant Attorney General

6

7                                JOHN R. GRIFFITHS
                                Assistant Branch Director

8                                    */s/ Peter J. Phipps*
                                PETER J. PHIPPS

9                                United States Department of Justice
                                Civil Division, Federal Programs Branch

10                               Tel: (202) 616-8482
                                Fax: (202) 616-8470

11                                peter.phipps@usdoj.gov

12                                Mailing Address:
                                Post Office Box 883

13                                Washington, D.C.  20044

14                                Courier Address:
                                20 Massachusetts Ave., N.W.

15                                Washington, D.C.  20001

16                                Attorneys for Defendants

17

18

19

20

21

22

23

24

25

26

27

28

1

## CERTIFICATE OF SERVICE

2       I hereby certify that on May 6, 2009, I electronically transmitted Defendants'

3  Memorandum in Support of Motion to Dismiss, attached hereto, to the Clerk's Office using

4  the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the

5  following CM/ECF registrants:

6                               Alfred W. Ricciardi
                                Aiken Schenk Hawkins & Ricciardi P.C.
7                               4742 North 24th Street, Suite 100
                                Phoenix, Arizona 85016
8                               (602) 248-8203

9
   Dated: May 6, 2009                     /s/ Peter J. Phipps
10                                         PETER J. PHIPPS

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28