# EXHIBIT A

Michael J. Farrell - 015056
mfarrell@jsslaw.com
**JENNINGS, STROUSS & SALMON, P.L.C.**
A Professional Limited Liability Company
The Collier Center, 11th Floor
201 East Washington Street
Phoenix, Arizona 85004-2385
Telephone: (602) 262-5911

*Attorneys for Amici Curiae United
Dairymen of Arizona, Shamrock Foods
Company, Shamrock Farms Company,
Parker Dairy Farms, Inc. and Dairy
Institute of California*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| HEIN HETTINGA AND ELLEN HETTINGA d/b/a SARAH FARMS; and GH DAIRY d/b/a GH PROCESSING,<br><br>        Plaintiffs,<br><br>vs.<br><br>EDWARD T. SCHAFER, SECRETARY, UNITED STATES DEPARTMENT OF AGRICULTURE; JAMES R. DAUGHERTY, ADMINISTRATOR OF THE ARIZONA MILK MARKETING ORDER; AND UNITED STATES OF AMERICA,<br><br>        Defendants. | No. CIV-08-2124-PHX-FJM<br><br>**UNITED DAIRYMEN OF ARIZONA, SHAMROCK FOODS COMPANY, SHAMROCK FARMS COMPANY, PARKER DAIRY FARMS, INC. AND DAIRY INSTITUTE OF CALIFORNIA'S MEMORANDUM OF AMICI CURIAE IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS** |

# TABLE OF CONTENTS

**Page**

BACKGROUND ................................................................................................ 1

DISCUSSION .................................................................................................. 4

A.   Plaintiffs allege no facts which support a claim that the MREA
     violates the equal protection element of the Fifth Amendment. ............ 4

1.   The MREA acts as an economic regulation. ............................... 4

2.   Congress provided a rational basis for the MREA. ................... 5

3.   One can find plausible reasons for the legislation in the
     pronouncements of the Secretary of Agriculture when he
     recently promulgated a Final Rule (the "Rule") that in
     part mirrors the MREA. .............................................................. 6

4.   Past regulations of the milk industry have met the rational
     basis test. .................................................................................. 6

5.   Plaintiff fails to allege sufficient facts to withstand a
     motion to dismiss its equal protection claim ............................ 7

6.   Other entities are affected by the MREA. ................................. 9

B.   The MREA is not a Bill of Attainder .................................................... 10

1.   The MREA applies and can apply to multiple parties and
     does not satisfy the specificity element of a bill of
     attainder. ................................................................................... 11

2.   The MREA furthers the nonpunitive goals of the AMAA
     and is not punishment under the Bill of Attainder Clause
     of the U.S. Constitution. ........................................................... 12

C.   The passage of the MREA in no way violated Due Process. ............... 15

CONCLUSION .............................................................................................. 17

# TABLE OF AUTHORITIES

**Cases**

*Am. Commc'ns. Ass'n, CIO v. Douds,* 339 U.S. 382, 414 (1950).............................. 15

*Bd. of Governors of Fed. Reserve Sys. v. Agnew,* 329 U.S. 441 (1947) ................... 16

*Bellsouth Corp. v. FCC*, 162 F.3d 678, 686 (D.C. Cir. 1998) ........................... 16, 17

*Benson v. Schofield,* 236 F.2d 719, 720-21 (D.C. Cir. 1956)......................................... 6

*City of N.Y.  v. Beretta U.S.A. Corp.*, 401 F. Supp.2d 244, 290 (E.D.N.Y. 2005)................................................................................................. 20

*City of New Orleans v. Dukes*, 427 U.S. 297 (1976)................................................... 8

*Cloverland-Green Spring Dairies, Inc. v. Pa. Milk Mktg. Bd.*, 462 F.3d 249, 253-55 (3d Cir. 2006) ................................................................ 6

*Communist Party of the U.S. v. Subversive Activities Control Bd.,* 367 U.S. 1, 88 (1961) .................................................................................... 5, 18

*Dandridge v. Williams,* 397 U.S. 471, 485 (1970).................................................. 12

*De Veau v. Braisted,* 363 U.S. 144, 160 (1960) ..................................................... 17

*Dent v. W. Va.,*  129 U.S. 114 (1889) .................................................................... 17

*Ex Parte McCardle*, 74 U.S. 506 (1889) .............................................................. 20

*FCC v. Beach Commc'ns Inc.,* 508 U.S. 307, 313 (1993) .......................... 8, 9, 11, 12

*FCC v. National Citizens Comm. for Broad.,* 436 U.S. 775 (1978).......................... 16

*Flemming v. Nestor,* 363 U.S. 603, 613-614 (1960) ............................................... 16

*Foretich v. U.S.,* 351 F.3d 1198, 1218 (D.C. Cir. 2003) ........................................... 17

*Hawker v. N.Y.*, 170 U.S. 189 (1898) .................................................................... 17

*Heller v. Doe*, 509 U.S. 312, 324 (1993).................................................................. 12

*Interstate Natural Gas Co. v. Southern California Gas Co.*, 209 F.2d 380, 385 (9th Cir. 1953) ................................................................ 13

*Lamers Dairy Inc. v. U.S. Dep't of Agric.,* 379 F.3d 466 (7th Cir. 2004)............ 10, 11

*Pa. v. Wheeling & Belmont Bridge Co*, 59 U.S. 421 (1855) ...................................... 20

*Robertson v. Seattle Audubon Soc'y*, 503 U.S. 429 (1992) ........................................ 20

*SeaRiver Mar. Fin. Holdings, Inc. v. Mineta*, 309 F.3d 662 (9th Cir. 2002) ....... 17, 18

*Selective Serv. Sys. v. Minn. Pub. Interest Research Group,* 468 U.S. 841, 853
(1984) ..................................................................................................... 15

*Shamrock Foods Co. v. Veneman*, 146 F.3d 1177 (9th Cir. 1998) ........................... 11

*U.S.  v. Brown*, 381 U.S. 437, 446 (1965) .................................................................. 19

*U.S. v. Rock Royal Co-op, Inc.*, 307 U.S. 533 (1939) ................................................ 15

*Williamson v. Lee Optical*, 348 U.S. 481, 483 (1955) .............................................. 12

**Statutes**

152 Cong. Rec. 1150 ............................................................................................ 9, 10

33 U.S.C. § 2737 ...................................................................................................... 17

7 C.F.R. § 1131.7(a) ................................................................................................. 15

7 U.S.C. § 608c ...................................................................................................... 6, 8

7 U.S.C. §§ 601, *et seq* ............................................................................................... 5

7 U.S.C. § 7253 .......................................................................................................... 6

71 Fed. Reg. 25495 (May 1, 2006) ........................................................................... 13

71 Fed. Reg. 9430 ....................................................................................................... 7

*Agriculture, Rural Development, Food and Drug Administration and Related
Agencies Appropriations Act of 2000,* Pub. L. No. 106-78, Title VII, §
760, 113 Stat. 1135 (1999) .................................................................... 6

*District of Columbia Appropriations Act of 2000,* Pub. L. No. 106-113, Title I,
Subtitle D, Ch. 1, § 143, 113 Stat. 1501 (1999). ................................. 6

*Federal Agriculture Improvement and Reform Act of* 1996, Pub. L. No. 104-
127, 110 Stat. 888 (1996) ..................................................................... 6

*Food Security Act of* 1985, Pub. L. No. 99-198, § 131-133, 99 Stat. 1354
(1985) ..................................................................................................... 6

*Milk in the Pacific Northwest and Arizona-Las Vegas Marketing Areas; Final Decision on Proposed Amendments to Marketing Agreement and to Orders*, 70 Fed. Reg. 74166 ........................................................................ 7, 10

Milk Regulatory Equity Act of 2005, Pub. L. No. 109-215, 120 Stat. 328 . 5, 9, 13, 19

**Other Authorities**

Black's Law Dictionary 176 (8th ed. 1969) ................................................................ 14

Amici Curiae United Dairymen of Arizona, Shamrock Foods Company, Shamrock Farms Company, Parker Dairy Farms, Inc. and Dairy Institute of California, by and through counsel, submit the following in support of Defendant's Motion To Dismiss.  Amici Curiae are either producers or handlers in the Arizona marketing order or a trade association of handlers in California who compete against GH Dairy.  Amici support all of Defendant's arguments and offer additional arguments.

The complaint suffers from flawed assumptions.  The Milk Regulatory Equity Act of 2005, Pub. L. No. 109-215, 120 Stat. 328, ("MREA"), especially when read in its entirety, has general application and affects business entities other than Sarah Farms and GH Dairy.  The claim fails to account for how rule-making, whether by Congress or its delegates, can ever be lawfully enacted.  Under the scenario painted by Plaintiffs in their complaint, no economic regulation could ever be lawful.  For instance, if the Internal Revenue Service identified a class of persons that were not paying any taxes and Congress chose to modify the Internal Revenue Code so as to capture the future taxes on the economics of those persons, the complaint would make such standard lawmaking unlawful.  This position is contradicted by long-standing principles laid out by the U.S. Supreme Court permitting, in order to protect the public welfare, legislation of conduct "whether that conduct is found to be engaged in by many persons *or one by one." Communist Party of the U.S. v. Subversive Activities Control Bd.,* 367 U.S. 1, 88 (1961).

## BACKGROUND

The Milk Regulatory Equity Act amends The Agricultural Marketing Agreement Act of 1937 ("AMAA").  7 U.S.C. §§ 601, *et seq.*  Through the AMAA, Congress responded to disruptions in agricultural commodity marketing during the Great Depression.  Among other things, this disruption harmed farmers by causing a severe drop in milk prices, primarily through competition for the more lucrative fluid milk market.  Through the AMAA, Congress, through the United States Department

of Agriculture ("USDA" or "the Secretary") initiated the federal program for the regulation of minimum milk prices that milk processors, known as handlers, must pay to dairy farmers, known as producers, and Congress delegated to the Secretary of Agriculture the authority to set minimum milk prices nationwide.  7 U.S.C. § 608c. *See generally Cloverland-Green Spring Dairies, Inc. v. Pa. Milk Mktg. Bd.*, 462 F.3d 249, 253-55 (3d Cir. 2006) (discussing history of and need for federal regulation of milk).

The AMAA and related regulatory program aim to prevent over supply, depressed prices and unstable marketing of milk by honoring long-cherished, repeated conclusions of Congress that without such orders, dairy farmers would engage in destructive competition for the higher end fluid milk market.  *Benson v. Schofield*, 236 F.2d 719, 720-21 (D.C. Cir. 1956) ("It is common knowledge that the production and marketing of milk are vital and the problems of the industry have long engaged the notice of the Congress, the state legislatures and the courts.").

Congress routinely and aggressively acts to preserve the milk order system implemented by the Secretary under the AMAA, demonstrating Congress' continued concern and legislative findings that milk, as an agricultural commodity, still requires special government intervention in order to "assure orderly marketing."  Since 1985 Congress has amended the AMAA dealing with milk marketing or directed specific action by the Secretary as to the milk order system at least four  times  in addition to the MREA .  7 U.S.C. §§ 608c and 7253; see *Food Security Act of* 1985, Pub. L. No. 99-198, § 131-133, 99 Stat. 1354 (1985);  *Federal Agriculture Improvement and Reform Act of* 1996, Pub. L. No. 104-127, 110 Stat. 888 (1996);  *Agriculture, Rural Development, Food and Drug Administration and Related Agencies Appropriations Act of 2000,* Pub. L. No. 106-78, Title VII, § 760, 113 Stat. 1135 (1999); *District of Columbia Appropriations Act of 2000,* Pub. L. No. 106-113, Title I, Subtitle D, Ch. 1, § 143, 113 Stat. 1501 (1999).

Large producer-handlers, entities like Sarah Farms, that serve both as dairy farms and processing plants, while subject to the regulatory program, have been largely exempted from the pooling and pricing system described above for purposes of administrative convenience.  Recent changes by the Secretary of Agriculture in the form of an Order published in the Federal Register on February 24, 2006, 71 Fed. Reg. 9430 (the "Rule"), and Congress, through the MREA, have ended that exemption for producer-handlers in the Western United States (which has the largest dairy farmers) that exceed a certain production level.  The Rule provides that any producer-handler in the Pacific-Northwest order or Arizona-Las Vegas order that produces, processes, and markets in the marketing area, more than 3 million pounds (approximately 330,000 gallons) of milk per month shall not be exempt from the pooling and pricing requirements. The MREA substantially mirrors the Rule with respect to producer-handlers in the Arizona-Las Vegas order.  The MREA also adds a provision requiring certain handlers to be subject to federal order prices if they sell to other plants in states where handlers must pay uniform minimum prices for raw milk (e.g. Montana and California).  This places a handler such as GH Dairy, located in the marketing area of a federal order on the same regulatory footing as the fully regulated handlers shipping into a state such as Montana or California.  Both Congress with respect to the MREA and the Secretary with respect to the Rule based their decisions on the desire to maintain a stable marketplace for the purchase and sale of milk.

Sarah Farms and GH Dairy, through their challenge to the MREA, wish to upset the long-standing policy of Congress and the regulatory program.  Sarah Farms is a large scale commercial producer-handler, larger than many of its regulated processor competitors and its dairy farmer counterparts.  *Milk in the Pacific Northwest and Arizona-Las Vegas Marketing Areas; Final Decision on Proposed Amendments to Marketing Agreement and to Orders*, 70 Fed. Reg. 74166, 74173 and 74182 (Dec 14, 2005).  The premise of the AMAA is that the benefits of the fluid

market will be shared by all dairy farmers through pooling.  Exemptions from pricing and pooling defeat uniformity.  Uniformity of treatment for both the processors using the milk and the dairy farmers producing the milk is the fundamental statutory requirement resulting in adjustments in accounts in order to achieve uniform payments as to all handlers including producers acting as handlers.  7 U.S.C. § 608c(5)(C).   For dairy farmers, an increase in contributions to the equalization pool enhances and equalizes their minimum prices.  For operators of fluid milk plants, or handlers, the requirement that all handlers, regardless of whether they are handlers or producer-handlers, participate in the equalization pool, results in a more level playing field.

## DISCUSSION

**A.     Plaintiffs allege no facts which support a claim that the MREA violates the equal protection element of the Fifth Amendment.**

1.     The MREA acts as an economic regulation.

Economic regulations are entitled only to rational basis review.  *City of New Orleans v. Dukes*, 427 U.S. 297 (1976) (applying rational basis to an ordinance that prohibited certain pushcart vendors from plying their wares in New Orleans' Vieux Carre).  Rational basis grants the legislature wide latitude in implementing the rules and regulations it believes necessary for effective governance.  *Id.* at 303.   When addressing equal protection challenges, courts consistently posit that "the judiciary may not sit as a superlegislature to judge the wisdom or desirability of legislative policy determinations made in areas that neither affect fundamental rights nor proceed along suspect lines."  *Id.*; *FCC v. Beach Commc'ns Inc.,* 508 U.S. 307, 313 (1993) (holding that equal protection embodied in either 14th Amendment or 5th Amendment "is not a license for courts to judge the wisdom, fairness, or logic of legislative choices.")   Because the MREA affects neither fundamental rights nor distinguishes treatment based on suspect class, this Court must apply the rational basis test in determining whether the MREA violates equal protection.  In fact, the preamble to the MREA itself provides that rational basis stating that it is an act, "to

1   ensure regulatory equity between and among all dairy farmers and handlers for sales

2   of packaged fluid milk in federally regulated marketing areas and into certain non-

3   federally regulated milk marketing areas from federally regulated areas, and for other

4   purposes." *Milk Regulatory Equity Act of 2005,* Pub. L. No.109-215, 120 Stat. 328.

5   PL 109-215 (April 11, 2006).

6               2.      Congress provided a rational basis for the MREA.

7          In determining whether a provision comports with equal protection principles,

8   the courts determine whether a plausible reason for Congressional action exists.

9   *Beach Commc'ns.*, 508 U.S. at 313-14 ("Where there are 'plausible reasons for

10  Congress' action, our inquiry is at an end'."). Congress is not required to provide

11  reasons for enacting statutes; in applying rational basis, courts may discern any

12  plausible reason for the legislation. *Beach Commc'ns.,* 508 U.S. at 315. As to the

13  MREA, Congress provided a plausible valid reason for enacting the legislation.

14         During the floor session prior to the passage of the MREA in the House, a

15  number of Congressmen commented on the purposes of the MREA. Representative

16  Cardoza perhaps summed it up best with his statement that "the foundation of this

17  legislation is that all dairy organizations should be governed by the same rules. One

18  group should not have an unfair competitive advantage over another. The Milk

19  Regulatory Equity Act ensures production and price of milk is fair and equitable."

20  152 Cong. Rec.1150, 1152 (March 28, 2006).

21         Representative Goodlatte also endorsed that reasoning, explaining that "the

22  Secretary of Agriculture protects dairy producers from predatory pricing by setting a

23  minimum price that must be paid by processors who distribute fluid milk within a

24  Federal Milk Marketing Order Area." *Id.* at 1150. With respect to the need for the

25  provision codified in section (M),[1] Representative Goodlatte added that "[b]ecause of

26  this loophole, milk produced in Arizona and sold in California is not subject to any

27

28  [1] Section (M) requires that certain handlers (for instance GH Dairy) to be subject to federal order prices if they sell to other plants in states where handlers must pay minimum prices for raw milk.

1  minimum pricing regulations.  This creates an unfair advantage for out-of-state fluid

2  milk processors." *Id.*  Rep. Goodlatte also commented that the current practice of an

3  Arizona plant selling to California without paying either the California or Federal

4  minimum price "is disrupting the marketplace and undermining the goal of fairness

5  that the regulatory system should encourage." *Id.* at 1151.  Plaintiffs offer no reason

6  why the stated reasons of Congress do not provide a rational explanation for the

7  MREA.

8          3.      One can find plausible reasons for the legislation in the
                   pronouncements of the Secretary of Agriculture when he
9                  recently promulgated a Final Rule (the "Rule") that in part
                   mirrors the MREA.
10
          The Secretary provided extensive explanations for the necessity of the Rule.

11  The Secretary, in the findings included in the Rule, explicitly acknowledges that the

12  combination of the changing retail landscape and the growth of certain producer-

13  handlers has resulted in a situation where the large producer-handlers are not bearing

14  the burden of their own surplus milk.  *Milk in the Pacific Northwest and Arizona-Las*

15  *Vegas Marketing Areas*, 70 Fed. Reg. 74166 (Dec 14, 2005).  Shifts in marketing

16  conditions or market structure lead to disorderly marketing, evidenced by lower

17  blend prices paid to dairy farmers shipping to regulated handlers.  *Id.* at 74,186.  The

18  producer-handlers are significantly larger in these two orders and while they are

19  solely responsible for their production and processing facilities, they are not

20  assuming the entire burden of balancing their production with their fluid milk

21  requirements.  *Id.*  The Secretary therefore found "that the burden of balancing has

22  been essentially shifted to the market's pooled participants."  *Id.* at 74,187.  Like the

23  Rule, the MREA aims to even out that burden among all milk processors.  Based on

24  the AMAA's purpose, this goal is clearly rational.

25          4.      Past regulations of the milk industry have met the rational basis
                   test.
26
          In *Lamers Dairy Inc. v. U.S. Dep't of Agric.*, 379 F.3d 466 (7th Cir. 2004),

27  

28  Lamers challenged the Secretary's order permitting cheese manufacturers to opt out

from regulated Class III pricing under certain circumstances.  Lamers alleged that the order violated equal protection because it, as a Class I handler, could never opt out of the regulations.  The Court held that the Secretary's order did not offend equal protection.  In so holding the *Lamers* court recognized that "The Secretary also is charged with establishing and maintaining orderly marketing conditions so as to ensure an orderly flow of supply and thereby prevent unreasonably fluctuating prices.  In order to achieve these legitimate marketing objectives, it is *conceivably rational* for the Secretary to treat Class I and Class III handlers differently with respect to pooling requirements."  *Lamers*, 379 F.3d at 473. (emphasis supplied).

> 5.   Plaintiff fails to allege sufficient facts to withstand a motion to dismiss its equal protection claim.

Because courts grant a strong presumption of validity to statutes imposing economic regulations, "those attacking the rationality of a legislative classification have the burden 'to negative every conceivable basis which might support it'."  *Beach Commc'ns.*, 508 U.S. at 314, 315.  Plaintiffs completely fail to allege any facts that would undermine the rationality of the MREA and therefore cannot withstand the government's motion to dismiss.

The Ninth Circuit has addressed a challenge to the constitutionality of a California law governing milk production and sale.  *Shamrock Foods Co. v. Veneman*, 146 F.3d 1177 (9th Cir. 1998).  Shamrock alleged that California's milk-related laws violated due process and equal protection.  Applying rational basis, the court explained that "[b]ecause California's interests in enacting the milk laws and regulations are legitimate, Shamrock must allege facts in the complaint to show that those laws and regulations are arbitrary or not rationally related to the state's goals in order to withstand the state's motion to dismiss."  *Shamrock Foods*, 146 F.3d at 1183.  The Court concluded that, "[t]here is nothing in the complaint that so much as suggests that the milk laws are either arbitrary or unrelated to the state's efforts to ensure a plentiful supply of healthy milk for its citizens.  It is insufficient to assert that the milk laws establish discriminatory classifications; the complaint must allege

1  facts to demonstrate that the classifications are arbitrary or that they are not rationally

2  related to legitimate state interests." *Id.*

3        The reasoning of the Ninth Circuit affirming dismissal of the case applies

4  equally to Plaintiffs' complaint in the instant case.  The complaint alleges that

5  Plaintiffs have been unfairly singled out, but the rationale behind the unfairness is

6  nothing more than the fact that Plaintiffs perceive themselves to be the only entities

7  affected by the legislation.  As the *Shamrock Foods* court held, alleged

8  discriminatory classifications do not suffice to overcome rational basis.  *Id.*  Despite

9  Plaintiffs' wishes, the equal protection doctrine does not require that every entity be

10  treated completely equally.  *Dandridge v. Williams*, 397 U.S. 471, 485 (1970) (a

11  classification does not fail rational-basis review because it  is not made with

12  mathematical nicety or because in practice it results in some inequality.)  "The law

13  need not be in every respect logically consistent with its aims to be constitutional.  It

14  is enough that there is an evil at hand for correction and that it might be thought that

15  the particular legislative measure was a rational way to correct it."  *Williamson v. Lee*

16  *Optical*, 348 U.S. 481, 483 (1955).  Congress believed that the exclusion of some

17  handlers from the regulated milk marketing system resulted in the "evil" of an

18  imbalanced, unstable market and has devised a method by which to correct this

19  "evil".  Rational basis requires only that the court determine whether there is a

20  plausible basis for the legislation and nothing more.  *Heller v. Doe*, 509 U.S. 312,

21  324 (1993) ("A statutory classification fails rational-basis review only when it 'rests

22  on grounds wholly irrelevant to the achievement of the State's objective'." ).  Courts

23  do not focus on whether all entities that "should" or "could" be included are

24  regulated by the legislation.  *Beach Commc'ns. Inc.*, 508 U.S. at 315-16 (explaining

25  that "Defining the class of persons subject to a regulatory requirement – much like

26  classifying government beneficiaries—'inevitably requires that some persons who

27  have an almost equally strong claim to favored treatment be placed on different sides

28  of the line, and the fact [that] the line might have been drawn differently at some

point is a matter for legislative, rather than judicial consideration'.")   No part of equal protection doctrine focuses on the number of entities affected by the legislation. This Court should dismiss the third claim for failure to state a claim.

### 6.    Other entities are affected by the MREA.

In addition to subjecting producer-handlers with distribution of over three million pounds per month and federal order based handlers with sales into State Orders to the same pricing and pooling regulations as other milk handlers, the MREA changes the rules for fluid milk processors located in Clark County, Nevada. Pursuant to the terms of the MREA, the Secretary of Agriculture amended all milk marketing orders.  MREA § (O); 71 Fed. Reg. 25495 (May 1, 2006):  "The Milk Regulatory Equity Act of 2005 specifically amends section 608c(11) of the AMAA by removing the following: 'The price of milk paid by a handler at a plant operating in Clark County, Nevada shall not be subject to any order under this section.'  This removal of the Clark County exemption results in handlers located in Clark County, Nevada, now being subject to Federal order minimum prices for their route sales in a Federal order marketing area."  71 Fed. Reg. 25496.[2]  Thus the MREA operates to bring into the federal pricing and pooling system both Sarah Farms, GH Dairy and any handlers in the Clark County, Nevada area selling packaged fluid milk into Arizona in competition with Sarah Farms, neither of which were previously subject to the minimum pricing and pooling provisions of the Order.   The MREA, read in its entirety, has far-reaching consequences intended to:

> ensure regulatory equity between and among all dairy farmers and handlers for sales of packaged fluid milk in federally regulated milk marketing areas and into certain non-federally regulated milk marketing areas from federally regulated areas. . .

Preamble to *Milk Regulatory Equity Act of 2005,* Pub. L. No.109-215, 120 Stat. 328. PL 109-215 (April 11, 2006).

---

[2] The Ninth Circuit has held that "records and reports of administratrive bodies" may be examined on 12(b)(6) review.  *Interstate Natural Gas Co. v. Southern California Gas Co.*, 209 F.2d 380, 385 (9th Cir. 1953)

Prior to the MREA, both Sarah Farms and Las Vegas - based processors were exempt from federal order pricing and pooling for any sales in Arizona.  The MREA simply reverses that course of action as to at least those entities.[3]  Plaintiffs' claims of unequal treatment clearly lack support in both the MREA and the implementing regulations and the Court should therefore dismiss their equal protection claim.

## B.    The MREA is not a Bill of Attainder

Economic regulation of future business conduct that may be avoided by altering the course of business activity and that is or may be applicable to a number of non-named entities cannot and does not constitute a bill of attainder.  The MREA is a classic example of legislation that is not a bill of attainder for each of the foregoing reasons. A bill of attainder is a special legislative action inflicting punishment upon a person.  Black's Law Dictionary 176 (8th ed. 1969).  There is no moral approbation or taint to subjecting fluid milk processors like, but not limited to, Sarah Farms and GH Dairy, to the economic pricing and pooling provisions of a federal milk marketing order in months after enactment of the MREA. Sarah Farms and GH Dairy may avoid regulation under this provision by altering their business conduct.  The MREA, taken as a whole, can and does alter the regulatory treatment of other fluid milk processors.  Taken to its logical conclusion, Plaintiffs' complaint would undercut, if not eliminate, the federal milk order system entirely.  If the regulation of Plaintiffs and others under MREA is an unlawful bill of attainder, then the AMAA must inevitably also be unlawful because it also applies in Arizona (and other orders) to a limited number of entities subject to business regulation of future conduct.  But the United States Supreme Court, together with all of the other courts that have reviewed this program over the 70 plus years of its existence have found

---

[3] It is relevant that to the best of Amici's knowledge, information and belief, the federal regulatory treatment of as many as 9 handlers (other than Sarah Farms and GH Dairy) was altered by the MREA.  And as discussed by the Government in its Motion to Dismiss, Sarah Farms' regulatory treatment actually remained the same under the April 1 implemented Final Rule and the May 1 implemented MREA.  It is simply untrue that Sarah Farms and GH Dairy were singled out in any way by this legislation.

precisely otherwise.  *U.S. v. Rock Royal Co-op, Inc.*, 307 U.S. 533 (1939) (and its numerous progeny).

> 1.   <u>The MREA applies and can apply to multiple parties and does not satisfy the specificity element of a bill of attainder.</u>

Plaintiffs would have this Court parse the MREA in order to assert (as oppose to prove) that it was singled out by the MREA.  First, and most obviously, Plaintiffs are not named anywhere in the MREA. Second, as discussed in the equal protection argument above, Plaintiffs are not able to assert that the MREA affects only them because Section (b) clearly results in the same rules for minimum pricing and pooling regulation applying to Las Vegas, Nevada (Clark County) based plants that sell packaged fluid milk into Arizona.[4]  For motion to dismiss purposes, we are limited to that universe of known regulated entities under the Arizona order as a result of the MREA.  But the universe of who may become or who may avoid regulation under the Arizona order under this provision is non-specific and "not immutable." *Selective Serv. Sys. v. Minn. Pub. Interest Research Group,* 468 U.S. 841, 853 (1984); *Am. Commc'ns. Ass'n, CIO v. Douds,* 339 U.S. 382, 414 (1950).

Plaintiffs could alter their business activity such that they no longer fit the administrative definition of a producer-handler (e.g. purchase raw milk from other sources or simply fail to provide the Secretary's local federal agent (known as the Market Administrator) with the required information to maintain producer-handler status) or by out selling milk into California.  Sarah Farms could reduce its milk marketings to under 3 million pounds in a given month.  Plaintiffs could sell all of their milk in Mexico or non-federally regulated Nevada (thus not meeting the definition of an Arizona federal order plant under 7 C.F.R. § 1131.7(a)).  In each of these cases, Plaintiffs would no longer be subject to regulation because of the Final

---

[4] In analyzing the MREA, the court must look to the statute as a whole, not simply to one part as Plaintiff suggests.  *U.S. Nat'l Bank of Oregon, Petitioner 92-484 v. Independent Ins. Agents of Am., Inc.*, 508 U.S. 439, 455 (1993) (holding that "over and over we have stressed that 'in expounding a statute, we must not be guided by a single sentence or member of a sentence, but look to the provisions of the whole law, and to its object and policy'.")

Rule or the MREA; instead Plaintiffs would either be regulated under different provisions of the pre-2006 Arizona order (if it gave up its producer-handler status) or simply not be regulated at all.   The MREA regulates future conduct and is thus not a bill of attainder.  *Flemming v. Nestor,* 363 U.S. 603, 613-614 (1960) (upholding termination of Social Security benefits of deported aliens as not constituting punishment for past conduct).

It is for these additional reasons that Amici agree with the Government's argument regarding the specificity element..  The MREA establishes an open-ended set of fluid milk processors whose future regulatory status can change (more federally regulated, less federally regulated or not federally regulated) based upon a number of fluid circumstances.

> 2.   The MREA furthers the nonpunitive goals of the AMAA and is not punishment under the Bill of Attainder Clause of the U.S. Constitution.

While the MREA's alleged impacts on Plaintiffs do not amount to an actual line of business restriction, as opposed to limited economic regulation, lines of business restrictions have been found routinely by the United States Supreme Court to be lawful without ever suggesting that they can constitute punishment, or constitute a potential unlawful bill of attainder.  *See, e.g. FCC v. National Citizens Comm. for Broad.,* 436 U.S. 775 (1978) (upholding ban for cross ownership of broadcast licensee and newspaper in the same market); *Bd. of Governors of Fed. Reserve Sys. v. Agnew*, 329 U.S. 441 (1947) (upholding rule preventing employees of securities firms from simultaneously working for Federal Reserve System banks).  In *Bellsouth Corp. v. FCC*, 162 F.3d 678, 686 (D.C. Cir. 1998) the D.C. Circuit found that the Telecommunications Act of 1996 was not a bill attainder upholding for the second time the constitutionality of the Telecommunications Act of 1996 despite repeated challenge that the Bell Operating Companies were singled out by name for business restrictions: "burdensome regulation simply cannot be equated with

1  punishment." *Id.* at 687 *citing De Veau v. Braisted,* 363 U.S. 144, 160 (1960) and

2  *Hawker v. N.Y.*, 170 U.S. 189 (1898).

3  Without conceding that the MREA might impose "burdensome" regulation,

4  Amici note that Plaintiffs do not and cannot allege more than burdensome regulation

5  as the basis for their complaint.  Congress, the Secretary, and the courts have

6  routinely and regularly found that federal milk order regulation remains necessary

7  both to protect dairy farmers and consumers, and in order to maintain a fresh and

8  wholesome supply of milk for the United States.  *See generally* Background Section

9  infra.  Thus, maintaining the system through appropriate regulation of entities that

10  might otherwise disrupt it is a "reasonable means" of ensuring the program's

11  survival. *Dent v. W. Va.,*  129 U.S. 114 (1889) (upholding educational and

12  certification requirements for those practicing medicine).

13  *SeaRiver Mar. Fin. Holdings, Inc. v. Mineta*, 309 F.3d 662 (9th Cir. 2002)

14  stands out; the Court upheld pollution control legislation that barred vessels from the

15  Prince William Sound, Alaska, if after March 23, 1989, the vessel had released more

16  than one million gallons of oil in the marine environment.  The "Exxon-Valdez" case

17  is relevant on its facts.[5]  In mid-1990, Congress passed and the President on August

18  18 signed the Oil Pollution Act.  Among other terms, the Oil Pollution Act contained

19  a provision banning from the navigable waters of the Prince William Sound, Alaska,

20  any tank vessel that had spilled more than 1,000,000 gallons of oil into the marine

21  environment after March 22, 1989.  33 U.S.C. § 2737.  The Exxon Valdez oil spill

22  occurred on March 23, 1989.  The *SeaRiver* court found the requisite specificity

23  element, notwithstanding the open future nature of the regulation, because of the

24  _____

25  [5]    *See also*, *Foretich v. U.S.,* 351 F.3d 1198, 1218 (D.C. Cir. 2003) (finding an
unlawful bill of attainder in Congressional action singling out specific persons,

26  making judicial judgments in legislation and otherwise casting moral and invidious
approbation on specific individuals)  The notorious 20-year long *Foretich* saga only

27  proves that when facts are uniquely bad enough (legislation named for person
benefited at expense of ex-husband, legislative "findings" contrary to court decisions
on the merits, moral judgments that affected fundamental rights regarding child-

28  rearing and visitation, and impacts on future jobs as a result of moral findings of fact
due to alleged past conduct), a court may find an unlawful bill of attainder.

specific date of March 22 chosen by Congress – clearly past conduct. *SeaRiver*, 309 F.3d at 670-673.   Nonetheless, the court concluded that the Oil Pollution Act did *not* inflict punishment on SeaRiver because it did not meet the historical meaning of legislative punishment, it furthered non-punitive legislative purposes, it lacked clear legislative intent to punish, and Sea River could not prove that there were less burdensome alternatives.  The MREA functions to revise the AMAA and thus is economic regulation, restoring equitable treatment to the Western United States. Thus, the MREA has a non-punitive rational purpose.

Only the clearest proof suffices to establish the unconstitutionality of a statute as a bill of attainder. *Communist Party of U.S. v. Subversive Activities Control Bd.*, 367 U.S. 1, 83 (1961).  Unlike SeaRiver, Plaintiffs have no way of showing that future regulation is based upon its past conduct.  The Exxon Valdez court found legitimate regulatory goals and Congressional focus on prospective risks to overcome any indicia (on the surface the legislation appears to be quite clearly based upon past conduct) of punishment – the key being that under the functional test and with the "clear evidence" rule applicable, *any* non-punitive reason for the legislation suffices to defeat a bill of attainder claim.  This is because, much like the equal protection analysis, discussed above, the court may rely on any legitimate concern that Congress may have had. *SeaRiver*, 309 F.3d at 675.  And the fact that Congress even knew (assuming that it did) that Plaintiffs would (assuming that the Final Rule didn't already impose it) have an additional cost imposed on it by the legislation "does not translate into a suggestion that Congress's intent was to punish" rather than to further the equitable regulatory goals of the AMAA. *Id.* at 674.

The facts and history of the Exxon Valdez are far more suggestive of a bill of attainder than Plaintiffs can possibly muster.  If that provision of the Oil Pollution Act does not operate as an unlawful bill of attainder, Plaintiffs far weaker claim against the MREA must perforce fail.  "By banning bills of attainder, the Framers of the Constitution sought to guard against such dangers by limiting legislatures *to the*

1  *task of rule-making.*" *U.S. v. Brown*, 381 U.S. 437, 446 (1965).  In passing the

2  MREA and in USDA's implementation of the MREA, that is precisely what the U.S.

3  government did – general, lawful rule-making.

4       **C.**    **The passage of the MREA in no way violated Due Process.**

5         Sarah Farms contends that "Section 2(a) of the MREA denied it due process

6  of law by foreclosing its ability to obtain effective judicial review of the Department

7  of Agriculture's Final Rule in the <u>Johanns</u> litigation in the United States District

8  Court for the Northern District of Texas."  Comp. at 60.  Sarah Farms seems to base

9  this contention on two pieces of information: first that counsel for the government

10  notified the court of the passage of the MREA prior to oral argument on the <u>Johanns</u>

11  matter; and second, that "in its decision denying the motion for a preliminary

12  injunction, the District Court noted that the passage of the Act effectively mooted

13  plaintiffs' legal challenge to the validity of the Department of Agriculture rule."

14  Comp. at 69-70.

15         The assertion regarding the court's consideration of the passage of the MREA

16  fails to tell the whole story.  The <u>Johanns</u> court denied the Hettinga's request for

17  preliminary injunction on the merits finding that plaintiffs had failed to demonstrate

18  irreparable harm because they only alleged financial harm, that plaintiffs failed to

19  demonstrate the likelihood of success on the merits and that they failed to establish

20  that the potential harm to Sarah Farms outweighs the potential harm to the

21  government and the Intervenors if the Rule is enjoined.  *See* "Order" filed March 30,

22  2006 in *Hettinga, et al. v. Johanns, et al.*, United States District Court for the

23  Northern District of Texas, Lubock Division, Civil Action No. 5:06-CV-052-C,

24  attached as Exh. 1 to the Declaration of Michael J. Farrell.  While the court order

25  recognized that Congress passed the MREA, it did so in a footnote preceded by the

26  caveat that the passage of the MREA was not outcome-determinative.  *Id.*  Given the

27  fact that the Court's Order clearly indicates that the Court adjudicated the motion for

28  preliminary injunction on its merits, the claim that the passage of the MREA

interfered with the lawsuit falls flat.  The voluntary dismissal of the complaints also belies their assertion today.  *See* "Stipulation of Dismissal" filed May 22, 2006 in *Hettinga, et al. v. Johanns, et al.*, United States District Court for the Northern District of Texas, Lubock Division, Civil Action No. 5:06-CV-052-C, attached as Exh. 2 to the Declaration of Michael J. Farrell.

Over a century of jurisprudence has permitted Congress to amend laws as it desires, regardless of the impact on pending litigation.  Any claim by Plaintiff that it was harmed by the timing of the passage of the MREA must fail.  In examining the constitutionality of New York's gun laws in light of outcome-determinative federal legislation that was passed while litigation was pending, the Eastern District of New York recently reiterated that, "the fact that the Act affects a pending case is not conclusive reason for denying its effect.  *See Ex Parte McCardle*, 74 U.S. 506 (1889)."  *City of N.Y.  v. Beretta U.S.A. Corp.*, 401 F. Supp.2d 244, 290 (E.D.N.Y. 2005).  Legislation that changes the underlying law to be applied to a pending matter has generally been accepted by the United States Supreme Court as a fair exercise of the legislature's Article II powers.  In *Pennsylvania v. Wheeling & Belmont Bridge Co*, 59 U.S. 421 (1855), the Supreme Court had held, based on existing state law, that a bridge did not comply with law and must be removed or renovated to meet state law requirements.  Congress then passed legislation validating the bridge as built.  *Id.* at 430.  When the Supreme Court was asked to enforce its initial order, it found that the intervening Act of Congress mooted its original holding and held that the action could no longer be maintained.  *Id.* at 431-32.

More recently, the Supreme Court addressed the issue of the validity of new legislation in *Robertson v. Seattle Audubon Soc'y*, 503 U.S. 429 (1992).  The *Robertson* court upheld a change to the Endangered Species Act through the Northwest Timber Compromise.  The Northwest Timber Compromise specifically referred to and impacted pending litigation.  The Supreme Court found that the

Timber Compromise "compelled changes in law, not findings or results under old law", and therefore passed constitutional muster. *Robertson*, 503 U.S. at 438.

Plaintiff's claim that the MREA impermissibly interfered with a right to challenge the Secretary's Rule fails to sustain a cause of action both on the facts and on the law.

## CONCLUSION

For all of the foregoing reasons, Amici respectfully request that this Court grant defendant's motion to dismiss.

RESPECTFULLY SUBMITTED this  27th day of May, 2009.

JENNINGS, STROUSS & SALMON, P.L.C.


By _____
      Michael J. Farrell
      The Collier Center, 11th Floor
      201 East Washington Street
      Phoenix, Arizona 85004-2385
      *Attorneys for Amici Curiae United*
      *Dairymen of Arizona, Shamrock Foods*
      *Company, Shamrock Farms Company,*
      *Parker Dairy Farms, Inc. and Dairy*
      *Institute of California*